34 A.3d 1233

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DANNY LAZO, DEFENDANT–APPELLANT.

Argued September 13, 2011—Decided February 1, 2012.

Wefing, Judge, Temporarily Assigned, filed a dissenting opinion.

*Ruth Bove Carlucci*, Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora*, Public Defender, attorney; *Ms. Carlucci* and *Ernest Anemone* on the briefs).

*Maria I. Guerrero*, Special Deputy Attorney General/Assistant Essex County Prosecutor, argued the cause for respondent (*Carolyn A. Murray*, Acting Essex County Prosecutor, attorney).

*Lawrence S. Lustberg* argued the cause on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Gibbons P.C.*, attorneys; *Mr. Lustberg* and *Eileen M. Connor*, on the brief).

*Deborah C. Bartolomey*, Deputy Attorney General, argued the cause on behalf of amicus curiae Attorney General of New Jersey (*Paula T. Dow*, Attorney General, attorney).

Chief Justice RABNER delivered the opinion of the Court.

In this case, we consider whether it was proper for a police officer to testify at trial about how and why he assembled a photo array. Although the officer had no personal knowledge of the crime committed, he told the jury that he believed defendant closely resembled a composite sketch of the assailant and therefore included a photo of defendant in the array. The officer showed the array to the robbery victim, whose eyewitness identification was the only evidence linking defendant to the offense.

The officer's testimony should not have been admitted in light of the principles outlined in *State v. Branch*, 182 *N.J.* 338, 865 *A.*2d 673 (2005). As *Branch* explained, an officer's reasons for placing

a particular photo in an array are irrelevant and prejudicial. *Id.* at 352, 865 *A.*2d 673. Here, the testimony improperly bolstered the victim's account and invaded the role of the jury to weigh the victim's credibility. For those and other reasons, including certain concerns about eyewitness identification testimony considered in *State v. Henderson*, 208 *N.J.* 208, 27 *A.*3d 872 (2011), we do not find that the error was harmless. We therefore reverse the judgment of the Appellate Division, which affirmed defendant's conviction, and remand for a new trial.

I.

The jury heard the following evidence at trial. Early in the morning on August 5, 2005, Angel Chalco left his home in Newark and headed toward the Bloomfield Avenue subway station to catch a train to work. He arrived at around 6:05 a.m. and noticed three men walking behind him as he entered the station. Seconds later, as he walked down the stairs, the men grabbed Chalco by the neck from behind, pulled him backward, and demanded money. One of the three men walked in front of Chalco and pointed a knife at his stomach. Chalco later identified that individual as the defendant. The men took the victim's wallet—with $200 and an identification card in it—and his cell phone. They then hit him on the head and kicked his stomach, causing him to lose consciousness and fall down.

After Chalco regained consciousness, he returned home and called the police. Soon after, he met with New Jersey Transit Police Detective Miguel Valido and described one of his assailants as a Hispanic male with a light complexion, eighteen to twenty-five years old, about five feet nine inches tall, and 150 pounds. Chalco added that the suspect was wearing a white t-shirt, blue jeans, and a baseball cap turned backward. That description was broadcast to patrol units. Chalco could not describe the other men who held him from behind.

The police transported Chalco to their headquarters, where he viewed about thirty photographs—on a computer—of people who

fit the suspect's description. Detective Valido testified that the photos came from the New York/New Jersey High Intensity Drug Trafficking Agency (HIDTA) network. At the time, Chalco did not identify anyone as his assailant.

While Chalco examined the photographs, Detective Valido learned that the police had detained a suspect in the area of the Broad Street station who matched Chalco's description. The detective took Chalco to the nearby scene and asked if he could identify the individual. From a distance of thirty feet or more, Chalco initially believed the person may have been one of his assailants. After getting a closer look at the suspect at the stationhouse, Chalco declared that the individual was not involved in the robbery.

Shortly afterward, and still within about ninety minutes of the robbery, a police sketch artist worked with Chalco and prepared a sketch of the assailant based on Chalco's description. Detective Valido was also present and helped translate for Chalco, who spoke Spanish. Chalco viewed samples of different facial features and selected the ones he believed were the closest matches to the attacker's features.

According to the detective, Chalco was "very certain" that the final version looked like the assailant. The police then disseminated the composite drawing to all patrol units. Detective Valido testified that he did not give a copy to Chalco.

Days later, the detective came across an arrest photo of Danny Lazo taken after he had jumped a turnstile on August 8, 2005. The detective thought Lazo's photo closely resembled the composite sketch. For that reason, Detective Valido included a photo of Lazo in an array of six photos he compiled. To comply with guidelines from the Attorney General, the detective used a two-year-old photo of Lazo from the HIDTA network instead of the more recent arrest photo. Chalco never saw the arrest photo.

Detective Valido showed Chalco the photo array on August 10, 2005, and Chalco identified the picture of Lazo as his assailant.

According to Chalco, when he looked at the array and made the identification, he also had a copy of the composite sketch in hand.

Detective Valido obtained an arrest warrant for defendant Lazo and arrested him the following day. A grand jury in Essex County later indicted defendant on two counts: second-degree conspiracy to commit robbery, *N.J.S.A.* 2C:5–2 and 2C:15–1; and first-degree robbery, *N.J.S.A.* 2C:15–1.

Defendant's trial began on November 28, 2006. Defense counsel did not request a *Wade* hearing before trial to challenge the identification procedure. *See United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

The State called Detective Valido and the victim, who recounted the above facts. During the detective's testimony, the State introduced in evidence the composite sketch, defendant's arrest photo, and the photo array. The detective also explained how he prepared the array. He noted that once he received the arrest photo, he noticed how closely it resembled the sketch, and he included Lazo's picture in the photo array because of his similarities to the victim's description. Defendant vigorously objected to both the introduction of the arrest photo and the testimony.

In addition to recounting the events of the robbery and his identification of defendant from the photo array, the victim identified defendant at trial. The victim's identification was the only evidence linking defendant to the crime. No physical evidence or other corroboration of the identification was presented.

Defense counsel offered an alibi defense. Defendant's mother, two brothers, and a friend, Angel Febus, testified that defendant was asleep at home at the time of the robbery. They testified that all four slept in the apartment that night and remembered the evening of August 4, 2005 and early the next morning—when the robbery occurred—for a number of reasons. In particular, the witnesses explained that defendant did not have to attend summer school that morning, that defendant's mother permitted Febus to sleep over, a rare occurrence, and that she checked herself in a

mirror in the boys' room and kissed them between 5:30 and 6:30 a.m.

The prosecution challenged and undermined defendant's alibi on cross-examination. Witnesses testified inconsistently as to whether anyone was ever permitted to sleep over at defendant's home and whether Febus had slept over before August 5, 2005.

In summation, the prosecutor argued "how convenient the defense witnesses['] testimony was" and repeatedly labeled certain facts as "convenient." A brief excerpt follows:

> How convenient is it that Ms. Rosado, Danny Lazo's mom, didn't have to go to work that day? That particular day, and every Friday, she didn't have to work. That's convenient. How convenient is it that summer school ended? And Mr. Lazo didn't have to go to summer school those last two days. How convenient is that? How about mom kisses her three sons, who by the way, ages 20, 19, and 16, who conveniently sleep in bunk beds together in the same room. She kisses them goodbye every morning. How convenient is that? She got up at 5:30, conveniently needed to use the mirror, as she does every morning, in a room where Danny Lazo was asleep....
>
> ....
>
> Well, ladies and gentlemen, you've heard a lot of testimony. No one ever slept over at this house. That was the rule .... But on August 5th, 2005, Mr. Febus slept over. Again, convenient.

The jury acquitted defendant of first-degree robbery but found him guilty of second-degree robbery, a lesser-included offense, and second-degree conspiracy to commit robbery. The trial court merged the conspiracy count into the robbery count and sentenced defendant to a seven-year term of imprisonment, with a period of parole ineligibility of eighty-five percent under the No Early Release Act, *N.J.S.A.* 2C:43–7.2. Defendant was also sentenced to a concurrent five-year term of imprisonment on a separate, unrelated robbery charge to which he pleaded guilty.

Defendant appealed. In an unpublished opinion, the Appellate Division affirmed his conviction and sentence. The panel rejected defendant's claim that the prosecutor implied defense counsel had fabricated an alibi; the court found no error in the prosecutor's summation and reasoned that it focused on the credibility of defense witnesses and not defense counsel. The panel also reject-

ed defendant's argument that the trial judge should not have admitted defendant's prior arrest photo or testimony from the detective comparing the sketch and defendant. Finally, the panel did not find a basis to disturb the sentence but remanded for a technical correction to the judgment of conviction.

We granted defendant's petition for certification. 203 *N.J.* 440, 3 *A.*3d 1228 (2010). We also granted motions for leave to appear as amicus curiae to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the Attorney General.

## II.

Defendant initially raised the same three arguments he presented on appeal: that it was prejudicial error for the trial court to admit a prior arrest photograph of defendant and permit a police officer, who had no personal knowledge of the offense, to testify that defendant's photo closely resembled the composite sketch; that the prosecutor's summation implied defense counsel had fabricated an alibi and thus constituted misconduct; and that the sentence was excessive.

The State counters each point and argues that introduction of the arrest photo and the officer's testimony was relevant and appropriate, that the summation properly addressed facts in the record and the credibility of defense witnesses, and that the sentencing judge properly considered and weighed relevant aggravating and mitigating factors in determining an appropriate sentence.

The ACDL introduces a new argument in its amicus filing, namely, that the composite sketch should not have been admitted in evidence. The ACDL relies on scientific evidence that it believes demonstrates that (1) composite sketches do not accurately depict suspects, and (2) the process of creating a composite sketch may contaminate memory and render later identifications unreliable. The ACDL argues that defendant's conviction should be reversed because of the introduction of the sketch and the detective's testimony about it. In the alternative, it seeks a

remand to assess the potential contamination of the eyewitness' memory and to examine the role that creation of the sketch played in the subsequent identification. In a supplemental brief, defendant adopts the ACDL's arguments.

The Attorney General's amicus brief responds to the ACDL. The Attorney General contends that much of the social science evidence cited relates to composites produced with computer or mechanical programs, not drawings prepared by sketch artists. The Attorney General also disputes that the process of creating a composite sketch taints an eyewitness' memory.

In a supplemental filing, the State argues that it would be inappropriate for this Court to address a claim defendant raised for the first time in a supplemental brief.

### III.

We begin with defendant's claim that neither his arrest photo nor the detective's testimony comparing it to the composite sketch should have been admitted.

### A.

An extended colloquy on those issues took place at trial. Defense counsel objected as soon as the prosecution identified the arrest photo during Detective Valido's testimony. Counsel maintained that the photo was "objectionable and irrelevant" because it had never been shown to the victim or included in the photo array. He then argued,

> I think [the prosecution] wants to try to be able to say that because this police officer was able to obtain this photograph by the time the photographs were shown to the victim that in his opinion it looks like ... the composite drawing. It's not his opinion that we're here to decide, that's the jury's role....

In response, the trial court observed that the arrest photo was "clearly" relevant because the officer had the photo and the sketch before he assembled the array. The trial court explained that

> [t]he fact that this wasn't shown to the victim doesn't make it any less relevant. I assume he will testify that it's authentic, it's in fact a picture of (audio disruption by

clerk) and that, in fact, he had this picture in his possession (audio disruption by clerk) this picture and the composite before putting together the array. It's like A plus B equals C. That's just like basic good lawyering.

Defense counsel pressed his objection and tried to prevent "any attempt to have this officer give his opinion that" the arrest photo and the composite sketch "are similar" because "that's the jury's function." The court replied that

[i]f it formed the basis for him preparing photographs, choosing photographs for the array, it is absolutely relevant, his opinion with regard to whether or not this looks like the composite; otherwise, how does the guy become a suspect, how does the guy have—how does he choose pictures.

With the arrest photo in evidence, Detective Valido testified as anticipated: he compared it to the sketch and explained how and why he designed the photo array. He told the jury, "[o]nce I received this photo, I saw how close it resembled the sketch. I inserted it in a photo array." (To be clear, the detective used a different, more dated photo of defendant in the array.) The detective added that he included defendant Lazo in the array "[b]ecause of his similarities to the suspects that were described by the victim."

## B.

There are any number of valid reasons for the State to offer a photo of a defendant to meet its burden of proof at trial. Arrest photos raise particular concerns, though, because they can inject prejudice by suggesting a defendant has a prior criminal record. As a result, if "identification is an issue and the State's use of a mug shot is reasonably related to that issue," an arrest photo may be admitted only if it is presented "in as neutral a form as possible." *State v. Taplin*, 230 *N.J.Super.* 95, 99, 552 *A*.2d 1015 (App.Div.1988) (citing *State v. O'Leary*, 25 *N.J.* 104, 115, 135 *A*.2d 321 (1957)).

Other jurisdictions follow a similar approach and use a three-part standard to determine when arrest photos may be admitted:

1. The Government must have a demonstrable need to introduce the photographs; and

2.  The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3.  The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

[*United States v. Harrington,* 490 *F.*2d 487, 494 (2d Cir.1973).] *See also United States v. Torres–Flores,* 827 *F.*2d 1031, 1038–39 (5th Cir.1987) (same); *United States v. Fosher,* 568 *F.*2d 207, 214 (1st Cir.1978) (same); *Brookins v. State,* 354 *A.*2d 422, 423 (Del. 1976) (same); *State v. Lemon,* 456 *A.*2d 261, 265 (R.I.1983) (same); *State v. Tate,* 288 *S.C.* 104, 341 *S.E.*2d 380, 381 (1986) (same).

In this case, the arrest photo did not imply that defendant had a prior criminal record. The photo was a neutral, frontal headshot of defendant with no identifying markings, notations, or numbers. In addition, Detective Valido did not explain how the photo came into his possession, refer to it as an arrest photo, or mention defendant's prior arrest. *Cf. State v. Cribb,* 281 *N.J.Super.* 156, 161–62, 656 *A.*2d 1279 (App.Div.1995) (reversing conviction that rested on single eyewitness' testimony when witness referred to defendant's photo as "mug shot").

Before this Court, the State now argues that defendant's arrest photo was relevant because it established defendant's physical appearance three days after the robbery and thus enabled the jury to evaluate the accuracy of the victim's description of his assailant at the time. By contrast, the photo array contained a two-year-old photo of defendant.

The State did not advance that reason at trial, however. There was neither testimony nor argument to the jury on the point. Instead, the photo was offered for an improper purpose: so that Detective Valido could compare it to the composite sketch and explain why he included defendant's photo in the array.

### C.

In *Branch, supra,* this Court addressed the limits of a police officer's trial testimony about the administration of a photo array. Defendant Branch was convicted of burglary and robbery based

primarily on the identification evidence of two witnesses. 182 *N.J.* at 346–47, 865 *A.*2d 673. At trial, "a police detective testified that he included defendant's picture in a photographic array because he had developed defendant as a suspect 'based on information received.' " *Id.* at 342, 865 *A.*2d 673. The jury learned nothing more about that source of information and was left with the impression that the detective had some other knowledge implicating defendant in the crime. *Id.* at 348, 865 *A.*2d 673.

The Court found that "[t]here was no legitimate need or reason for [the detective] to tell the jury why he placed defendant's picture in the photographic array. The only relevant evidence was the identification itself." *Ibid.* Instead, the jury heard irrelevant, "gratuitous hearsay testimony" that violated defendant's right to confrontation and the rules of evidence. *Ibid.* As a result, the Court reversed his conviction. *Id.* at 354, 865 *A.*2d 673.

To address the specific evidentiary error presented as well as general concerns about testimony that explains the thought process behind a photo array, the Court offered the following guidance for future cases:

> When a police officer testifies concerning an identification made by a witness, such as in this case, what counts is whether the officer fairly arranged and displayed the photographic array and whether the witness made a reliable identification. *Why the officer placed the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial.* For that reason, we disapprove of a police officer testifying that he placed a defendant's picture in a photographic array "upon information received." Even such seemingly neutral language, by inference, has the capacity to sweep in inadmissible hearsay. It implies that the police officer has information suggestive of the defendant's guilt from some unknown source.
>
> [*Id.* at 352, 865 *A.*2d 673 (emphasis added) (citation omitted).]

Although the error in *Branch* led to the admission of prejudicial hearsay testimony, the reasoning of the case and its cautionary language extend to testimony about the identification process in general.

It was therefore error for the detective in this case to tell the jury why he included defendant's photo in the array. The evidence was not relevant—indeed, there was no challenge of any

sort to the array—and the testimony ran afoul of *Branch.* And just as in *Branch,* the error invited problematic testimony into the trial. In essence, the detective told the jury that he believed defendant closely resembled the culprit—even though the detective had no personal knowledge of that critical, disputed factual question. By doing so, the officer enhanced the victim's credibility and intruded on the jury's role. The *Branch* error also led to the admission of improper lay opinion testimony.

Certain courts have considered lay opinion testimony similar to Detective Valido's under *N.J.R.E.* 701 and comparable rules. Lay witnesses may present *relevant* opinion testimony in accordance with *Rule* 701, which permits "testimony in the form of opinions or inferences ... if it ... is rationally based" on the witness' "perception" and "will assist in understanding the witness' testimony or in determining a fact in issue." *N.J.R.E.* 701.

Other jurisdictions have considered lay opinion testimony by law enforcement officials called on to identify a defendant from a photograph. The Ninth Circuit, for example, evaluated testimony at a bank robbery trial by a probation officer who said he believed the defendant was depicted in a bank surveillance photo. *United States v. Beck,* 418 *F.*3d 1008, 1011 (9th Cir.2005). The court explained that "lay witness testimony is permissible where the witness has had 'sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.'" *Id.* at 1015 (quoting *United States v. Henderson,* 241 *F.*3d 638, 650 (9th Cir.), *cert. denied,* 532 *U.S.* 986, 121 *S.Ct.* 1634, 149 *L.Ed.*2d 494 (2001)). Whether that opinion is "helpful," the court continued, depends on various factors including the witness' familiarity with the defendant's appearance when the crime was committed, or with the defendant's manner of dress, if relevant, whether the defendant disguised his appearance during the offense or altered her looks before trial, and "whether the witness knew the defendant over time and in a variety of circumstances." *Id.* at 1015 (citations omitted).

Applying that standard, the *Beck* court concluded it was not error for a probation officer to opine that the defendant matched a

surveillance photo in light of multiple prior contacts between the two individuals. *Ibid.* (The witness did not mention his status as a probation officer or the nature of his contacts with the defendant. *Id.* at 1013.)

In a similar fact pattern that more closely resembles this case, though, the Ninth Circuit found it was error for a police officer to have identified a defendant from a bank surveillance photo because the officer "not only did not know [defendant], he had never even seen him in person." *United States v. LaPierre*, 998 *F*.2d 1460, 1465 (9th Cir.1993). Like Detective Valido, the officer's knowledge of the defendant's "appearance was based entirely on his review of photographs of [defendant] and witnesses' descriptions of him." *Ibid.*

Courts evaluating whether a law enforcement official may offer a lay opinion on identification also consider, among other factors, whether there are additional witnesses available to identify the defendant at trial. *See, e.g., United States v. Butcher*, 557 *F*.2d 666, 670 (9th Cir.1977) (allowing testimony but noting that "use of lay opinion identification by policemen or parole officers is not to be encouraged, and should be used only if no other adequate identification testimony is available to the prosecution"); *State v. Carbone*, 180 *N.J.Super.* 95, 97–100, 433 *A*.2d 827 (Law Div.1981) (allowing lay witness testimony and noting lack of available eyewitness identification, change of defendant's appearance, and familiarity with his appearance at time of crime).

In addition, courts recognize that when there is no change in a defendant's appearance, juries can decide for themselves—without identification testimony from law enforcement—whether the person in a photograph is the defendant sitting before them. *See Butcher, supra*, 557 *F*.2d at 669; *United States v. Calhoun*, 544 *F*.2d 291, 295 (6th Cir.1976).[1]

---

[1] We do not follow *State v. Loftin*, 287 *N.J.Super.* 76, 99–100, 670 A.2d 557 (App.Div.), *certif. denied*, 144 *N.J.* 175, 675 A.2d 1123 (1996), which permitted a

In this case, Detective Valido's opinion that defendant's arrest photo closely resembled the composite sketch was not based on prior knowledge. The detective had not witnessed the crime and did not know defendant; the officer's opinion stemmed entirely from the victim's description. Nor was there a change in appearance that the officer could help clarify for the jurors; they could have compared the photo and the sketch on their own. Finally, the sole eyewitness told the jury what he observed firsthand. As a result, even if there had been no *Branch* error, the officer's opinion could not pass muster under *Rule* 701.

Because the detective's testimony had no independent relevance, it merely served to bolster the victim's account. Despite a lack of personal knowledge, the detective conveyed his approval of the victim's identification by relaying that he, a law enforcement officer, thought defendant looked like the culprit as well.

In an identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant. Guided by appropriate instructions from the trial judge, juries determine how much weight to give an eyewitness' account. *State v. Farrow,* 61 *N.J.* 434, 451, 294 *A.*2d 873 (1972), *cert. denied,* 410 *U.S.* 937, 93 *S.Ct.* 1396, 35 *L.Ed.*2d 602 (1973). Neither a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province. *See State v. Frisby,* 174 *N.J.* 583, 593–96, 811 *A.*2d 414 (2002).

---

detective's lay witness opinion that the suspect in a videotape was the defendant. For support, the panel cited *Carbone, supra,* without additional analysis. *Id.* at 100, 433 *A.*2d 827. The decision in *Loftin* did not consider "crucial factors" that distinguished *Carbone*: the lack of any available eyewitness identification, the change of defendant's appearance, and the law enforcement witnesses' familiarity with defendant for many years. *See Carbone, supra,* 180 *N.J.Super.* at 97, 99, 433 *A.*2d 827. None of those circumstances were present in *Loftin.* In particular, an eyewitness identified the defendant at trial, *Loftin, supra,* 287 *N.J.Super.* at 88, 670 *A.*2d 557, and the detective's opinion was based on comparing a composite sketch to a videotape, not on prior knowledge of the defendant, *id.* at 99–100, 670 *A.*2d 557.

### D.

■ Finally, the ACDL objects to the introduction of the composite sketch.

The sketch is a visual depiction of the victim's description of his assailant. Under *State v. Ginardi*, the sketch is admissible as a prior identification under *N.J.R.E.* 803(a)(3). 111 *N.J.Super.* 435, 453–54, 268 *A.*2d 534 (App.Div.1970), *aff'd o.b. per curiam*, 57 *N.J.* 438, 273 *A.*2d 353 (1971). The ACDL questions the continuing validity of *Ginardi,* notes that other jurisdictions treat composite sketches as hearsay, and argues that defendant's conviction should be reversed. The ACDL also raises concerns about composites in light of certain scientific evidence. It argues in the alternative that a hearing is needed to assess the effect of the creation of the composite on the victim's later identification.

■ Defendant adopts the ACDL's position in a supplemental brief before this Court. He did not raise those issues at trial, before the Appellate Division, or in his petition for certification. The ACDL, no doubt, devoted great time and effort to its detailed brief. But we do not reach the ACDL's arguments because, "as a general rule, an *amicus curiae* must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties." *See Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n,* 91 *N.J.* 38, 48–49, 449 *A.*2d 1254 (1982) (citations omitted); *see also State v. Cabbell,* 207 *N.J.* 311, 327 n.10, 24 *A.*3d 758 (2011) (declining to address issue first raised by party in supplemental brief to Supreme Court). We also note that the arguments presented are not central to resolving this appeal.

The ACDL filed its brief before this Court issued its decision in *Henderson.* Although we noted skepticism about certain composite sketches in *Henderson, supra,* 208 *N.J.* at 258–59, 27 *A.*3d 872 we did not exclude their use in investigations or their introduction at trial.

IV.

We next examine whether the error in admitting Detective Valido's lay opinion testimony—to which defendant objected—calls for reversal. The harmless error standard "requires that there be 'some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" *State v. R.B.*, 183 *N.J.* 308, 330, 873 *A.2d* 511 (2005) (alterations in original) (quoting *State v. Bankston*, 63 *N.J.* 263, 273, 307 *A.2d* 65 (1973)).

Defendant's conviction rests solely on the identification evidence the jury heard: from the victim, and, mistakenly, from the detective. There is no physical evidence or any other corroborating evidence to support the victim's recollection. Turning to the victim's identification, we note that it raises several concerns addressed in *Henderson*. Although we do not apply the holding in *Henderson* because it is prospective only, *see Henderson, supra*, 208 *N.J.* at 302, 27 *A.3d* 872 we consider relevant scientific evidence evaluated at the remand hearing and by this Court.

First, the identification process was administered by the investigating detective who knew which photo in the array matched the suspect. Reliable scientific evidence presented during the remand hearing in *Henderson* revealed that lineup administrators may intentionally or unintentionally influence a witness' identification decision. *Henderson, supra*, 208 *N.J.* at 248–49, 27 *A.3d* 872 (citations omitted). We therefore found that "the failure to perform blind lineup procedures can increase the likelihood of misidentification." *Id.* at 250, 27 *A.3d* 872.

Second, during the attack, while the victim was forcibly held by the neck from behind, the assailant pointed a knife at the victim's stomach. As the remand hearing in *Henderson* also demonstrated, "[w]hen a visible weapon is used during a crime, it can distract a witness and draw his or her attention away from the culprit." *Id.* at 262, 27 *A.3d* 872. We concluded that "when the interaction is brief, the presence of a visible weapon can affect the reliability

of an identification and the accuracy of a witness' description of the perpetrator." *Id.* at 263, 27 *A.*3d 872. According to the victim's testimony, the interaction appears to have been brief.

Third, a conflict in the evidence raises the possibility that the police used a highly suggestive technique in administering the photo array. The State's case relied on the victim's recollection of events. At each step, the prosecution properly urged the jury to credit his testimony. Yet Chalco also testified that he had a copy of the composite sketch when he examined the photo array. Detective Valido disputed that. Absent a *Wade* hearing, the trial court had no reason to make a credibility finding on this important contradiction.

If Chalco actually had the composite sketch in hand as he selected a photo in the array, it would be difficult to know whether he was testing his memory of the assailant or simply picking a photo that most resembled the sketch. For that reason, such a highly suggestive identification technique would not be appropriate.

Thus, the detective's testimony improperly bolstered an identification that itself raises concerns about reliability. And that identification is the sole basis for defendant's conviction. Under those circumstances, we cannot conclude that the error was harmless. We are therefore required to reverse defendant's conviction and remand for a new trial.

## V.

We add the following about certain testimony at trial. Detective Valido testified, without objection, that on the day of the robbery, he showed the victim about thirty photographs from the "New York/New Jersey HIDTA, High Intensity Drug Trafficking Agency network." The detective explained that the network is a compilation of photographs from various county, state, municipal, and federal agencies. Later in his testimony, the detective said that he used photos from the HIDTA network to compile the

photo array. He also referred to the HIDTA system twice during cross-examination.

The trial judge carefully instructed the jury not to draw any improper conclusions from the source of the photos.[2] That said, references to a *drug trafficking* computer network used by law enforcement can raise a specter of wrongdoing that does not belong in a case. In the future, unless there is a reason to the contrary, law enforcement witnesses should provide a neutral description of the source of photographs used in an investigation— and not refer to drug trafficking—to avoid potential prejudice. For example, they can instead refer to a computer network or database of photographs maintained by a government agency. Such an approach would be consistent with the model charge that courts should continue to use.

In requiring this practice, we rely on our supervisory powers under Article VI, Section 2, Paragraph 3 of the State Constitution to ensure the integrity of criminal trials. *See Henderson, supra,* 208 *N.J.* at 270–71, 278, 27 *A.*3d 872.

## VI.

Defendant also argues that the prosecutor's repeated use of the word "convenient" during summation constituted reversible

---

[2] The judge gave the following standard instruction:

There are in evidence photographs that were used to identify the defendant in this case. With reference to the photographs submitted into evidence, you'll notice that many or all of the photographs appeared to have been taken by a law enforcement agency, or some other governmental entity.

You are not to consider the fact that the agency obtained a photograph of the defendant as prejudicing him in any way. The photographs are not evidence that the defendant has ever been arrested or convicted of any crime. Such photographs come into the hands of law enforcement from a variety of sources, including, but not limited to, drivers license applications, passports, ABC identification cards, various forms of government employment, private employment requiring State regulations including, but not limited to, casino license applications, security card applications, etcetera, or from a variety of other sources totally unconnected with criminal activity.

error. We address that argument briefly in case the issue resurfaces at a retrial.

■ Prosecutors "are expected to make vigorous and forceful closing arguments to juries." *State v. Smith,* 167 *N.J.* 158, 177, 770 *A.*2d 255 (2001) (citations omitted). They may comment on facts in the record and draw reasonable inferences from them, *id.* at 178, 770 *A.*2d 255 (citation omitted), and may remark on the credibility of a defense witness' testimony, *State v. Munoz,* 340 *N.J.Super.* 204, 218, 774 *A.*2d 515 (App.Div.), *certif. denied sub nom. State v. Pantoja,* 169 *N.J.* 610, 782 *A.*2d 427 (2001).

■ Consistent with their obligation to seek justice, prosecutors may not advance improper arguments. They cannot cast unjustified aspersions on defense counsel or the defense, *State v. Frost,* 158 *N.J.* 76, 86, 727 *A.*2d 1 (1999), or imply that defense counsel and defense witnesses "concocted" an alibi, *Munoz, supra,* 340 *N.J.Super.* at 217–18, 774 *A.*2d 515.

Here, the prosecutor's comments were based on sharply disputed facts in the record and reasonable inferences that could be drawn from them. In context, calling the testimony of defense witnesses "convenient" was directed at their credibility. At no point did the prosecutor mention defense counsel or suggest that counsel concocted an alibi.

The prosecutor's comments were within the "considerable leeway" afforded in closing argument. *Smith, supra,* 167 *N.J.* at 177, 770 *A.*2d 255. We do not find any error.

## VII.

In light of the disposition of this case, we do not address defendant's challenge to his sentence.

## VIII.

For the reasons stated above, we reverse the judgment of the Appellate Division, vacate defendant's conviction, and remand for a new trial.

Judge WEFING (temporarily assigned), dissenting.

I write separately because I am unable to join the views and analysis of my colleagues. Based on a brief phrase in this Court's opinion in *State v. Branch*, 182 *N.J.* 338, 865 *A*.2d 673 (2005), and two cases from the Ninth Circuit Court of Appeals, my colleagues conclude that the testimony offered by Detective Valido fatally tainted defendant's trial. I consider the Court's conclusion in this matter a significant expansion of the principle we laid down in *Branch*. Further, I consider this matter wholly distinguishable from the situations presented in the two federal cases. Finally, I am troubled by my colleagues' reference to *State v. Henderson*, 208 *N.J.* 208, 27 *A*.3d 872 (2011), which we carefully noted was to be given wholly prospective effect. *Id.* at 302, 27 *A*.3d 872. I am concerned that the Court's reference to *Henderson* may be misinterpreted as foreshadowing a retreat from that position.

In *Branch, supra*, Kathleen O'Nieal was talking with a family friend, Joseph Gannon, when she heard screams from the upper floor where her two children were sleeping. 182 *N.J.* at 343, 865 *A*.2d 673. Almost immediately an intruder came down the stairs, ran past the two adults, and tried to get out the back door. *Ibid.* The door handle jammed, but after a brief delay, the intruder opened the rear door and fled. *Ibid.* The police arrived promptly. *Ibid.* The police were unable to develop any physical evidence at the scene, but they did take descriptions from O'Nieal, Gannon and the two children. *Id.* at 344, 865 *A*.2d 673. The descriptions were not entirely consistent with respect to the intruder's height and apparent age. *See ibid.* Both O'Nieal and Gannon said the intruder had little or light facial hair. *Ibid.* A police sketch artist worked with Gannon to prepare a sketch. *Id.* at 345, 865 *A*.2d 673. The detective assigned to the case prepared a photo array. *ibid.* O'Nieal and Gannon were unable to identify any of the individuals. *Ibid.* A second array was prepared about one week later, and the two adults independently selected the defendant's picture. *Ibid.* They also identified the defendant at trial. *Ibid.* In

both his picture and at trial the defendant had a moustache and beard. *Ibid.*

At trial, the detective was questioned about the preparation of those photo arrays. *Id.* at 347, 865 *A.*2d 673. He was asked if, "based upon information received," he had developed a suspect in the case. *Ibid.* (emphasis omitted). He responded affirmatively and identified the defendant as the suspect. *Ibid.* He continued that he obtained a photo array that contained the defendant's picture. *Ibid.* The detective explained that both adults independently selected that picture from the array. *Ibid.* The sketch produced by the police artist bore little resemblance to the defendant or to the picture included in the array. *Id.* at 345, 865 *A.*2d 673. The defendant was convicted at trial of second-degree burglary and second-degree robbery. *Id.* at 346, 865 *A.*2d 673.

In *Branch,* we reversed the defendant's conviction, finding that the testimony that the detective had, "based upon information received," developed the defendant as a suspect had impermissibly conveyed to the jury that the detective "had superior knowledge [obtained] through hearsay information implicating [the] defendant in the crime." *Id.* at 347–48, 865 *A.*2d 673 (emphasis omitted). We stressed that under Sixth Amendment principles, a police officer may not convey to the jury that he has superior knowledge outside the record that incriminates the defendant. *Id.* at 352–53, 865 *A.*2d 673.

Nothing within Detective Valido's testimony in this case conveyed that thought, however. Here, the detective simply testified that he came into possession of a photograph of defendant and was struck by its similarity to the sketch produced by the police artist. The Court finds no error in the testimony about how the detective came to see the photograph. It notes that "Detective Valido did not explain how the photo came into his possession, refer to it as an arrest photo, or mention defendant's prior arrest." Op. at 20, 34 *A.*3d at 1239 (citing *State v. Cribb,* 281 *N.J.Super.* 156, 161–62, 656 *A.*2d 1279 (App.Div.1995)). The Court describes the photograph as "neutral ... with no identifying markings, notations, or

numbers." Op. at 20, 34 *A.*3d at 1239. Nothing within that testimony or the photograph implied that the detective was relying on undisclosed information. He fully described the information he had to the jury, which was able to draw its own conclusions with respect to the strength of the comparison between the two. The similarity is, in the words of the prosecutor in her summation, "remarkable."

*Branch* relied on the violation of the defendant's Sixth Amendment confrontation rights to reverse his convictions, but I can find nothing in Detective Valido's testimony that is at all comparable to such a violation. *Branch,* in my judgment, does not warrant a reversal of this conviction.

Nor do I find any authority in the Ninth Circuit cases cited by my colleagues; I consider both to involve significantly different factual complexes. In *United States v. Beck,* 418 *F.*3d 1008 (9th Cir.2005), the defendant was charged with bank robbery. *Id.* at 1011. Testimony at trial included that of the teller, two other individuals who were in the bank at the time of the robbery, and the defendant's probation officer. *Id.* at 1011–12. Based on the descriptions of those present at the time and the surveillance tape that recorded the incident, a photo array was prepared. *Id.* at 1011. Two of the witnesses selected the defendant's picture while the third selected another photo. *Ibid.* Defendant's probation officer (his role as a probation officer was not disclosed to the jury) was permitted to testify that he had reviewed the surveillance tape and based on his familiarity with the defendant, he identified the defendant as the robber. *Id.* at 1011–12. The court's discussion of lay opinion testimony occurred in the context of the court finding no error in the identification testimony of the probation officer, based on his familiarity with the defendant. *Id.* at 1013–15.

The Court also cites to *United States v. LaPierre,* 998 *F.*2d 1460 (9th Cir.1993), which it describes as "more closely" resembling the present case to support its reversal of defendant's conviction. Op. at 22–23, 34 *A.*3d at 1241. I am unable to agree that *LaPierre*

"closely" resembles this case for it contains several distinguishing features of significance. The first of these is that the *LaPierre* court reversed the defendant's conviction, not because of identification testimony, but because the defendant's attorney had not been present at the line-up, a violation of the defendant's Sixth Amendment right to counsel. *LaPierre, supra,* 998 *F.*2d at 1463–64.

According to the facts of the case, the defendant was charged with bank robbery, like the defendant in *Beck. Id.* at 1462; *Beck, supra,* 418 *F.*3d at 1010. Again, there was a surveillance tape of the incident. *LaPierre, supra,* 998 *F.*2d at 1465. An officer investigating the robbery was permitted to testify before the jury that the individual seen in that surveillance tape was the defendant. *Ibid.* The court referred to that testimony as having "dubious value" but declined to hold that it constituted reversible error, leaving that determination to abide the defendant's retrial. *Ibid.*

*LaPierre* does not, in my judgment, warrant reversing this defendant's conviction. Detective Valido's testimony explaining his preparation of the photo array is not comparable to that of the witnesses in *Beck* and *LaPierre* who interpreted a grainy surveillance video to the jury as containing a picture of the defendants.

Here, Detective Valido's testimony did not identify this defendant as the culprit, as did the testimony in *Beck* and *LaPierre.* It did not unfairly suggest superior knowledge nor intrude on the jury's function. In sum, I find no reason to conclude that defendant is entitled to a new trial, and I would affirm.

*For reversal/vacation/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, HOENS, and PATTERSON—6.

*For affirmance*—Judge WEFING (temporarily assigned)—1.