**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4395-18T4

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

DAMIAN SANCHEZ,

    Defendant-Respondent.

_____

Argued December 19, 2019 – Decided   January 27, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 19-01-0144.

Linda Anne Shashoua, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Linda Anne Shashoua, of counsel and on the brief).

Robert C. Wolf argued the cause for respondent.

PER CURIAM

On leave granted, the State appeals a May 3, 2019 Law Division order suppressing the testimony of defendant Damian Sanchez's parole officer identifying him in a photograph connecting him to alleged criminal activity. We reverse.

In the afternoon of September 8, 2017, J.F. returned from visiting her twin sons in the neonatal intensive care unit to the apartment she shared with J.M., her children's father. Eleven-year-old B. and his younger brother went outside to play. J.M. remained in the front room while J.F. walked towards the bathroom, holding their eighteen-month-old child. She heard the front door open, turned, and saw an African-American male dressed in black and wearing a black mask over his face. The man pulled out a gun and asked J.M. "where the money was." Before he could answer, the man shot J.M. in the head.

The shooter was accompanied by a stocky Hispanic-looking male approximately five-foot nine inches tall. The men asked J.F. about the location of the safe, to which she directed them. J.F. claimed it held $10,000 in cash.

The men took the money and fled in a red or burgundy vehicle, eventually traced to Danny Smith, defendant's co-defendant. The pending indictment charges defendant with two counts of first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1); two counts of first-degree conspiracy to commit armed robbery,

N.J.S.A. 2C:5-2 and 2C:15-1(a)(1); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); fourth-degree aggravated assault by pointing, N.J.S.A. 2C:12-1(b)(4); two counts of third-degree child endangering, N.J.S.A. 2C:24-4(a)(2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b).

An Attempt to Locate flyer was circulated by the Camden County Prosecutor's Office Intelligence Unit to all area law enforcement officers. It describes the vehicle as having been "possibly used" in a homicide, and lists the date, time, and place of the incident. It stated that the person depicted in the front passenger seat was "described as a Hispanic male, stocky build approximately [five-foot nine inches]. . . ."

Upon seeing the flyer, defendant's parole officer notified the Pennsauken Police, the investigating department, that the photo depicted defendant, whom she had supervised for over a year after his release from prison on an aggravated manslaughter conviction. She reported that he may be involved with the MS13 street gang. Additionally, approximately a week after the date of the murder, defendant had told his parole officer he was changing phone numbers—she gave police both.

A-4395-18T4

J.F.'s eleven-year-old son was interviewed a few days after the incident. B. told police that he held the door open for Smith, as Smith and defendant entered the building. As the men passed by, he noticed that Smith's phone read "are you ready." B. identified Smith from a photo array; nothing in the record we have been provided on appeal indicates that he was able to identify the second man in the hallway, nor that J.F. was able to identify him. Smith was located through the surveillance videos from the area, which captured the images of the getaway vehicle, his girlfriend's car. Subsequent investigation established that defendant and Smith had phone contacts that day, and cell phone records placed defendant in the vicinity of the crime.

The Law Division judge applied Evidence Rule 701 to the issue in dispute, reasoning that where a witness is not testifying as an expert, but is nonetheless offering an opinion, the testimony must be rationally based on the witness's perception, and must assist the fact finder in determining a fact at issue. The judge concluded that the parole officer's testimony did neither. Since she did not witness the crime, he did not consider her identification to be "based upon [her] perception . . . ." He continued, "even if it was based on the perception of the witness, it would not assist the jury in understanding or determining a fact in issue. It will not assist the jury . . . because it invades the jury province."

A-4395-18T4

Relying on <u>State v. Lazo</u>, 209 N.J. 9 (2012), the judge further found that where there is no change in a defendant's appearance, jurors can decide for themselves, without identification testimony from law enforcement, whether the person in a photograph admitted in evidence is the defendant sitting before them. Thus, he ruled the parole officer's testimony inadmissible. Put another way, because the parole officer had not witnessed the crime, and the State did not claim that defendant had altered his appearance, he granted defendant's motion to suppress the parole officer's testimony.

The judge also analyzed the motion pursuant to Evidence Rule 403, weighing the prejudicial effect against probative value. He opined that admission "would be significantly prejudicial, and outweigh to a great degree the limited probative value." The judge further opined that no curative instruction would suffice to remedy the prejudicial effect of the jury learning that defendant was on parole for aggravated manslaughter. Nor did he believe he could limit defendant's scope of cross-examination of the parole officer, which would naturally focus on the bias or predisposition of the officer in making the identification because of the similarity in crimes, as to do so would deprive defendant of a fair trial. Lastly, the judge said that "the State's concerns can be satisfied by . . . having the . . . State's witness testify that based upon

information received, they narrowed their suspect down to [defendant] and having [defendant] stipulate that the phone number that the State has is his phone number."

The law in this area is scant. In Lazo, an investigator located the defendant's arrest photograph, which he believed looked like a composite sketch of a crime suspect. Id. at 14. He showed Lazo's photograph to the victim in a properly constituted photo array. Id. at 14-15. During the investigator's testimony at trial, the State introduced the composite sketch, and the old arrest photo. The investigator explained how he narrowed the suspects down to Lazo, selected his photo, and prepared the array. Id. at 15. The investigator told the jury that he included defendant's picture in the photo array because of "his similarities to the victim's description." Id. at 19. The defendant objected both to the introduction of the arrest photo and the testimony. Ibid. The victim identified the defendant at trial. Id. at 15.

The Court discussed State v. Branch, 182 N.J. 338, 342 (2005), and the principle clearly expressed in that case that a jury need not know the reason a defendant's photograph is placed in an array for identification by a witness. Lazo, 209 N.J. at 21. Analogizing the facts in Lazo to those in Branch, the Court concluded the detective should not have explained to the jury why defendant's

photo was shown to the victim as "[t]he evidence was not relevant . . . ." Ibid. "In essence, the detective told the jury that he believed defendant closely resembled the culprit—even though the detective had no personal knowledge of that critical, disputed factual question. By doing so, the officer enhanced the victim's credibility and intruded on the jury's role." Id. at 22. In other words, the investigator's testimony constituted a detailed explanation of reasons the jury could rely upon the victim's identification.

In Lazo, however, the Court distinguished situations in which a police officer merely, as stand-alone testimony, says that a surveillance photo looks like a defendant. Id. at 22-23. The Court favorably cited cases where such lay opinion identification by law enforcement is allowed in the federal system when no other identification testimony is available. Ibid.

In Lazo, the officer's testimony regarding his opinion that the composite sketch was similar to the photograph was not relevant to the issue of identification. Id. at 24; see also id. at 21. It was truly duplicative of conclusions that a jury could independently reach. Id. at 13, 24. The officer did not need to justify his selection of the picture he included in an array shown to the victim because the victim identified Lazo as the perpetrator once shown the array. Id. at 24. The Court contrasted that testimony with testimony by probation officers

or parole officers who opine merely that a defendant "matched a surveillance photo in light of multiple prior contacts between the two individuals." Id. at 22-23. The permissible testimony only connects a defendant to a surveillance photo—but the jury must still decide whether all the proofs, including those related to identification, establish that the State has proven defendant's guilt beyond a reasonable doubt. See id. at 24.

In United States v. Beck, 418 F.3d 1008, 1015 (9th Cir. 2005), for example, the court approved of testimony by a federal probation officer identifying the defendant pictured in a surveillance photograph taken during a bank robbery. Pursuant to the trial judge's directive at Beck's trial, the probation officer only stated that he had a professional relationship with the defendant requiring regular bi-monthly meetings, and that as a result he believed the defendant was the person depicted in the bank surveillance photograph. Id. at 1013. The testimony was admitted in accord with Federal Rules of Evidence 403 and 701, analogous to our own Rules of Evidence. "The Federal Rules of Evidence have been the source of many, although not all, of our Rules of Evidence[,]" including Evidence Rules 403 and 701. State v. Rinker, 446 N.J. Super. 347, 362 (App. Div. 2016). "We therefore frequently consider[] instructive federal precedent construing analogous Federal Rules of Evidence."

Ibid. The court reiterated that a lay witness's testimony is "rationally based within the meaning of Rule 701 where it is 'based upon personal observation and recollection of concrete facts.'" Beck, 418 F.3d at 1015 (quoting U.S. v. Allen, 787 F.2d 933, 935 (4th Cir. 1986)). In this case, Beck and the cases following are highly instructive on how the pertinent evidence rules should be read.

The trial judge suggested the outcome of defendant's motion might have been different if defendant's appearance changed between the commission of the offense and trial. But that is not the only circumstance in which such testimony may be admitted. The real question is whether "the witness knew the defendant over time and in a variety of circumstances, such that the witness's lay identification testimony offered to the jury 'a perspective it could not acquire in its limited exposure' to the defendant . . . ." Ibid. (quoting Allen, 787 F.2d at 936). No single factor is dispositive. Ibid.

The Beck court concluded:

> . . . [the parole officer] had met with Beck four times in a two-month period, for a total of more than seventy minutes. [The parole officer] had sufficient contacts with Beck so that [his] perception of the person in the bank surveillance photo was helpful to a clear understanding of the determination of a fact in issue, that is, the identity of the person in the bank surveillance photo. We hold that the [D]istrict [C]ourt did not err in determining that [the parole officer's] lay opinion identification testimony was rationally based

and helpful to the trier of fact, and the [D]istrict [C]ourt did not abuse its discretion in admitting [the parole officer's] testimony.

[Ibid.]

Insofar as the Rule 403 analysis, the State has no eyewitness testimony available. The only testimony which connects defendant to the photo taken from the video of the alleged getaway car is that of the parole officer. Once the police had a name, further investigation resulted in the discovery of the cell phone information, which corroborated defendant's presence in the area. Thus, the probative value of the testimony is substantial.

Defendant contends that the testimony cannot be admitted, in part because a neutral presentation would prejudicially limit cross-examination. In Beck and similar federal cases, the proposed testimony omitted any mention of the law enforcement role played by the witness. It was presented as a professional relationship, requiring regular meetings. Defense counsel here argues this neutral presentation bars him from exploring any potential bias on the part of the parole officer who made the identification. That is a strategic decision that a defendant is entitled to make—whether he would prefer to have the witness's status disclosed to the jury to show the identification witness was predisposed to see the somewhat unclear photo of defendant as a person involved in a crime,

A-4395-18T4

or to present a neutral relationship and forego cross-examination with regard to bias. In weighing admissibility pursuant to Rule 403, the probative value of this testimony is so substantial, however, that it outweighs any potential prejudice that defendant may suffer by losing the opportunity to cross-examine on the area of how bias may have predisposed the witness to see a similarity where none existed.

The jury will, regardless of the parole officer's testimony, decide for itself whether the similarity between defendant and the passenger in the still photo is so great that when joined with the other available proofs, it would prove defendant's guilt beyond a reasonable doubt.

Thus, applying <u>Lazo</u> and the federal cases it cites, we conclude that the testimony was admissible, and reverse and remand. Obviously, should defendant elect to present to the jury the testimony that the witness was defendant's parole officer, it is not necessary to reveal the nature of the prior offense.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11