RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4392-13T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

JOSHUA M. GREEN,

 Defendant-Appellant.
__________________________________

 Argued October 25, 2016 – Decided August 21, 2017

 Before Judges Fisher, Ostrer and Vernoia.

 On appeal from the Superior Court of New
 Jersey, Law Division, Middlesex County,
 Indictment No. 12-02-0322.

 Rochelle Watson, Assistant Deputy Public
 Defender, argued the cause for appellant
 (Joseph E. Krakora, Public Defender, attorney;
 Ms. Watson, of counsel and on the brief).

 Nancy A. Hulett, Assistant Prosecutor, argued
 the cause for respondent (Andrew C. Carey,
 Middlesex County Prosecutor, attorney; Ms.
 Hulett, of counsel and on the brief).

PER CURIAM

 A jury found defendant guilty of second-degree attempt to

commit aggravated sexual assault by sexual penetration during a
kidnapping, N.J.S.A. 2C:14-2(a)(3) and N.J.S.A. 2C:5-1; second-

degree kidnapping (as a lesser-included offense of first-degree

kidnapping), N.J.S.A. 2C:13-1(b); and second-degree attempt to

commit sexual assault, N.J.S.A. 2C:14-2(c) and N.J.S.A. 2C:5-1.

The convictions arose out of an attack on September 15, 2011 at a

nutrition products store in Perth Amboy. Minutes after the store

opened for business in the pre-dawn hours, a man walked in, forced

the sole employee, Maria,1 into a rear bathroom, threw her against

the sink and toilet, and tried to rape her. After two regular

customers entered the store, the assailant tried to barricade

Maria in the bathroom with a mop and then fled. A surveillance

video from a neighboring store recorded him as he entered and,

minutes later, ran from the store, but the picture quality was

poor.

 The trial focused on identification, as the State lacked

forensic evidence tying defendant to the crime. Months after the

attack, the victim identified defendant from a photo array and

identified him again in court. With some uncertainty, one of the

regular customers also identified defendant in court, after he

previously did not identify him from a photo array.

1
 We use pseudonyms to protect the privacy of the victim and
eyewitnesses.

 2 A-4392-13T3
 As his principal point on appeal, defendant contends the

court erred in allowing the State to bolster these two witnesses

by (1) permitting Perth Amboy police officers involved in the

investigation to opine that defendant was depicted on the video

despite lacking any prior personal familiarity with defendant; and

(2) allowing testimony that defendant's photo was included in the

array because a South Brunswick police officer, who was familiar

with defendant, believed he was the man in the video.

 I.

 Maria told police that her attacker entered the store soon

after it opened and ordered a nutrition shake. While Maria's back

was turned to prepare the drink, he grabbed her from behind,

dragged her to the bathroom and locked the door behind him. He

then tried to sexually assault her in various ways, choking and

striking her in the face and neck when she resisted.

 Gerardo was the first regular customer to enter the store the

morning of the attack. He overheard what he believed was an

argument in the bathroom. He heard Maria tell a man to let her

go. Then, he saw a man exit and run out of the store. Maria came

out, crying and apparently beaten, and said the man had tried to

rape her. The second customer, Miguel, passed the fleeing man as

he entered the store.

 3 A-4392-13T3
 Maria was reluctant to call the police. She said that in El

Salvador, from which she emigrated, women who accused men of rape

were often killed. However, a coworker who arrived around 8:40

a.m. called the police and persuaded Maria to cooperate. Perth

Amboy Police Detective Marcos Antonio Valera and Detective Sandra

Rivera arrived soon thereafter. The police made no effort to

collect fingerprint or DNA evidence from the scene. Detective

Valera explained that multiple people had entered the store after

the attack.

 The eyewitnesses did not provide identical physical

descriptions of the attacker. According to Detective Valera,

Maria said she saw her attacker's face when he ordered a shake,

but he "didn't let me see" him while they were in the bathroom.

In her initial statement, she said her assailant was a twenty-four

to twenty-six year old black male; he was taller than Detective

Valera who is six feet tall; his hair was curly; he had a big

mouth; and a face that appeared "pulled back." Detective Rivera

testified that Maria said her attacker had a protruding mouth,

"small ears, big eyes and his face was kind of drawn, kind of long

and he was kind of lanky . . . ."

 Later that day, Maria was unable to identify her assailant

from about 400 photos — none of defendant — that police presented

 4 A-4392-13T3
to her. She also did not make an identification from a photo

array a week later.

 Gerardo said the assailant was black, between eighteen and

twenty years old. He did not see his face, which he said was

covered with a jacket. But, he confirmed that the man shown

running from the store on the surveillance video was the man he

saw flee the store. According to witnesses, the fleeing man wore

shorts and a team jersey.

 Miguel told Detective Valera that he saw the assailant well

and he was confident he could identify him if he saw him again.

In a statement given on the day of the attack, Miguel said the

assailant appeared to be a young black man, eighteen or nineteen

years old, weighing about 125 to 130 pounds, and about five foot

seven.

 Detective Valera took two still photos from the neighboring

store's surveillance video and disseminated them to other police

departments seeking assistance in identifying the man pictured.2

South Brunswick Detective Roger Tuohy responded that he believed

the still photos were of Joshua Green, with whom he was familiar.

He sent photos he had of defendant. Notwithstanding Detective

2
 The trial court overruled defense counsel's pre-trial objection
to admission of the bulletin Detective Rivera disseminated. None
of the photographic or video exhibits introduced in evidence has
been included in the record on appeal.

 5 A-4392-13T3
Valera's alleged belief, based on Detective's Tuohy's input, that

defendant committed the assault, the police took no immediate

steps to arrest him, to place him under surveillance, or to seek

a warrant to search his apartment for clothing that matched those

worn by the man in the video.

 Soon after the attack, Maria called Detective Valera to say

she believed she saw her attacker board a bus that stopped near

her workplace. But, when police stopped the bus in another town,

they did not identify any passenger who looked like the attacker.

Maria herself was not permitted to view the passengers.

 On November 17, 2011, Detective Rivera noticed a man at a bus

stop in Perth Amboy who, based on the photos Detective Tuohy had

supplied, looked like defendant. Detective Rivera, who was out

of uniform, struck up a conversation with the man, who identified

himself as Joshua Green. She also surreptitiously took photographs

of him.

 Police did not show Maria an array with defendant's photo

until November 25.3 Maria selected defendant's photo with

certainty. Miguel also reviewed the same November 25, 2011 photo

array. He said defendant's photo looked most like the man who

fled the store, but when asked if he is was sure, he said no. He

3
 The photo used in the array was one from an unrelated arrest of
defendant.

 6 A-4392-13T3
later testified that he was fifty to seventy percent certain that

defendant's photo matched the fleeing man, but he remained silent

because he thought he needed to be entirely certain.

 Detective Valera arrested defendant a week later. He was

then twenty years old, five-foot-ten, with a "very thin build."

When arrested, defendant reportedly said he weighed 168 pounds.

He was not wearing glasses; by contrast, defendant wore glasses

at trial. Detective Valera testified that, at trial, defendant

looked even heavier than 168 pounds.

 In court, Maria identified defendant as her attacker. In

contrast to her statement to Detective Valera, she said she got a

look at his face when he spoke to her in the store, as well as in

the bathroom. She said, "he had big ears, . . . his eyes were

also big, his mouth was big, very thin, and . . . his hair were,

[sic] like, very high." She asserted she provided Detective Rivera

with additional details about her attacker after she completed her

formal recorded statement, including that her attacker's hair was

messy and his hair was not jet black, but dark. However, when

defendant stood up in court, Maria said he was much shorter than

he appeared the day of the attack. Still, she was "certain it's

him." She also noted he did not wear glasses during the attack.

On cross-examination, defense counsel attempted to highlight

 7 A-4392-13T3
inconsistencies between her trial testimony and her statement to

police the day of the attack.

 Miguel also made an in-court identification. At trial, he

said defendant's face was thin and his hair curly. He also

confirmed that the man depicted in the video was the attacker. He

noted the man he saw running from the store was not wearing

glasses. However, Miguel admitted he was "not positive" defendant

was Maria's attacker. Asked how sure he was, he replied,

"[s]eventy percent."

 The eyewitnesses' testimony was bolstered by the testimony

of the investigating officers. Detective Valera testified he

"received information that this [the still photos] was Josh Green

in September of 2011 from [Detective] Tuohy . . . ." Detective

Valera also identified defendant as the person depicted in the

surveillance footage who first walked by the store, then returned

to enter, and later ran out. He also identified defendant in

court.

 Without objection, the State was permitted to ask Detective

Rivera to state "who was the perpetrator of [the] crime" against

Maria. She stated without reservation, "Joshua Green," and

identified him in court. She explained that Detective Tuohy told

her that he recognized the person in the circulated photos to be

defendant. She testified that when she met defendant at the bus

 8 A-4392-13T3
stop in Perth Amboy, she identified him as the person in the

surveillance video. She asserted that defendant was the person

depicted in the still shots taken from the surveillance video, the

photos supplied by Detective Tuohy, and photos she surreptitiously

took of defendant when she met him at a Perth Amboy bus stop. She

opined that defendant at trial looked heavier than he did when she

saw him at the bus stop. This was also the first time she saw him

wearing glasses. On cross-examination, she conceded that she

could not positively identify defendant as the person in the

surveillance video, even after Detective Tuohy sent photos of

defendant.

 Detective Tuohy testified that he had known defendant for

four or five years based on "dealings" in South Brunswick. 4 He

stated that he recognized Joshua Green as the individual depicted

in the photos Detective Rivera sent and identified him in court.

He said, with respect to one photo, he believed it depicted

defendant because the person's posture matched defendant's. He

4
 The defense objected pretrial to permitting Detective Tuohy to
testify that he recognized defendant based on his prior arrests.
The State informed the court that Detective Tuohy knew of defendant
based on being an officer on patrol in South Brunswick, and was
aware of, but was not directly involved in, prior arrests of
defendant in the township. The court prohibited any reference at
trial to defendant's prior arrests. Defense counsel also objected
to Detective Tuohy reviewing the surveillance footage, or the
photos taken from the footage, to identify defendant.

 9 A-4392-13T3
stated if he "had to guess," he was "probably . . . around 80

percent" positive that defendant was the man in the photos.

 An employee of a temporary employment agency in Perth Amboy

testified that defendant obtained work through their office, which

was located a short distance from the store where Maria was

attacked. Defendant worked the second shift of the day of the

attack, beginning at 4:00 p.m., for a firm in Carteret. The agency

provided transportation from Perth Amboy at about 3:00 p.m. The

agency representative testified that workers could arrive as early

as 6:00 a.m. to seek assignments, and could be sent out for work

early in the morning for the first shift of the day. But the

agency had no record that defendant sought work on the morning of

the attack.

 Over defendant's objection, the State was permitted to

introduce a recording of a telephone conversation between

defendant and his mother while defendant was incarcerated

(although his incarceration was not disclosed to the jury).

Defendant asked his mother to look for glasses that he claimed he

wore to an interview in Perth Amboy on the day of the attack and

noted that Maria's attacker was not said to be wearing glasses.

Defendant's mother agreed to buy a pair if she could not find

them.

 10 A-4392-13T3
 The State contended the conversation demonstrated

consciousness of guilt because records of medical examinations

from November 2011 and 2012, which the State introduced, indicated

that defendant had twenty-twenty vision. The court ruled that the

conversation was admissible because defendant admitted to being

in Perth Amboy on the day of the attack. The court declined to

exclude references to the glasses.

 The State also introduced medical records indicating that

defendant's weight grew from 146 pounds in November 2011 to 172

pounds a year later. It also reported his height at five-foot-

eleven and then five-foot-ten on those same dates. However, the

arrest report showed that defendant weighed 168 pounds when he was

arrested on December 1, 2011.

 Defendant did not testify, but his mother did. She asserted

defendant was home the morning of the attack and she left with

defendant around 8:30 a.m. She went to Dunkin' Donuts by the bus

stop where she normally dropped defendant off for the bus to New

Brunswick. As proof, she providing a Dunkin' Donuts receipt

generated at 8:43 a.m. She testified that she only went "that

way" in the morning when she was dropping defendant at the bus.

She said defendant was going to take a bus to New Brunswick and

then another bus to Perth Amboy because "[h]e said he had a job

 11 A-4392-13T3
interview." She noted, however, that he did not have to be at

work until 3:00 p.m.

 On cross-examination, without objection, the State confronted

Ms. Green with a twenty-three-year-old conviction for third-degree

theft by deception from 1990. She testified that she received

probation and admitted she also violated probation.

 In summation, defense counsel contended defendant was

misidentified. He noted Maria viewed the photo array months after

the incident. He highlighted the lack of forensic evidence,

inconsistencies in Maria's statements, and Miguel's uncertainty

in his identification. He challenged the police detectives'

identification, arguing that if the police had been sure defendant

was the attacker, they would have acted sooner.

 The State emphasized that defendant was identified not only

by Maria and Miguel, but also Detectives Tuohy and Rivera (omitting

without explanation Detective Valera's identification). The

prosecutor highlighted defendant's contacts with Perth Amboy. She

also referred to defendant's phone call regarding his glasses and

contended that defendant wore glasses to court "[t]o perpetrate a

fraud on the Court . . . ." She challenged Ms. Green's credibility,

highlighting her past conviction for theft by deception.

 The jury found defendant guilty of second-degree kidnapping,

as it declined to find he failed to release Maria unharmed;

 12 A-4392-13T3
attempted aggravated sexual assault during the commission of a

kidnapping; and attempted sexual assault. The jury found him not

guilty of criminal restraint. After merger, the court imposed

concurrent ten-year terms on the kidnapping and attempted

aggravated sexual assault counts, both subject to the No Early

Release Act, N.J.S.A. 2C:43-7.2, and Megan's Law, N.J.S.A. 2C:7-1

to -23.

 On appeal, defendant presents the following points for our

consideration:

 POINT I

 BECAUSE IDENTIFICATION WAS THE CRITICAL ISSUE
 BEFORE THE JURY, INADMISSIBLE TESTIMONY ABOUT
 WHY DEFENDANT'S PHOTO WAS INCLUDED IN THE
 ARRAY AND INADMISSIBLE LAY OPINION TESTIMONY
 FROM INVESTIGATING OFFICERS, IDENTIFYING
 DEFENDANT AS THE PERSON ON THE SURVEILLANCE
 FOOTAGE, INFRINGED HIS RIGHT TO A FAIR TRIAL.
 (PARTIALLY RAISED BELOW).

 A. Testimony That Defendant's Photo
 Was Included in the Array Because the
 Police Had Concluded that Defendant
 Resembled the Surveillance Footage Was
 Inadmissible and Unduly Prejudicial.

 B. Lay Opinion Testimony from
 Investigating Detectives, Identifying
 Defendant as the Suspect on the
 Surveillance Footage was Improper and
 Prejudicial.

 POINT II

 THE COURT ERRED IN ADMITTING IN EVIDENCE A
 PHONE CALL BETWEEN DEFENDANT AND HIS PARENTS,

 13 A-4392-13T3
 WHICH THE STATE USED AS PROOF OF CONSCIOUSNESS
 OF GUILT. THE PREJUDICE TO DEFENDANT WAS
 COMPOUNDED BY THE JUDGE'S FAILURE TO GIVE THE
 REQUIRED JURY INSTRUCTION. (PARTIALLY RAISED
 BELOW).

 POINT III

 THE ALIBI WITNESS'S TWENTY-THREE-YEAR-OLD
 THIRD-DEGREE CONVICTION WAS INADMISSIBLE AS
 TOO REMOTE TO IMPEACH CREDIBILITY AND THE
 PROSECUTOR COMMITTED MISCONDUCT IN ARGUING
 THAT THE VICTIM WAS MORE CREDIBLE BECAUSE SHE
 HAD NO CRIMINAL CONVICTIONS. (NOT RAISED
 BELOW).

 POINT IV

 A RESENTENCING IS NECESSARY BECAUSE THE COURT
 FAILED TO SUPPORT ITS FINDING OF AGGRAVATING
 FACTOR ONE WITH COMPETENT CREDIBLE EVIDENCE
 IN THE RECORD, INDEPENDENT OF THE ELEMENTS OF
 THE CRIME.

 II.

 Identification of Maria's attacker was the principal focus

of the trial. We are convinced that Maria's and Miguel's

identifications of defendant was improperly bolstered by (1) the

Perth Amboy detectives' explanation that defendant's photo was

placed in the array based on the information that South Brunswick

Detective Tuohy had provided; and (2) the Perth Amboy detectives'

identification of defendant as the man in the surveillance video.

 We turn first to the issue of the photo array. "[A]n

officer's reasons for placing a particular photo in an array are

irrelevant and prejudicial." State v. Lazo, 209 N.J. 9, 12-13

 14 A-4392-13T3
(2012) (citing State v. Branch, 182 N.J. 338, 352 (2005)).

Moreover, when those reasons may lead a jury to infer past contact

with law enforcement, the courts have found them generally

inadmissible due to their limited probative value and prejudicial

effect. See, e.g., State v. Tilghman, 345 N.J. Super. 571, 578-

79 (App. Div. 2001).

 In Tilghman, an officer testified "that when he heard the

victim's description, he suspected that the assailant was

defendant because he knew him." Ibid. The apparently neutral

testimony implied "the officer knew defendant because of

defendant's prior criminal conduct." Ibid. Although the testimony

"explain[ed] why defendant's photograph was included in the

array[,]" it was unnecessary to the victim's identification "and,

if anything improperly bolstered it by letting the jury know that

the victim had chosen the photograph of the person the officer

already suspected." Ibid.

 Similarly, in Branch, the Court found inadmissible an

officer's testimony that he included a defendant's photo in an

array "upon information received" because it implied hearsay

information from an unknown source about the defendant's guilt.

Branch, supra, 182 N.J. at 352. The Court concluded, "The jury

only needed to know that the police fairly displayed the

 15 A-4392-13T3
photographs to the witnesses and that the process led to a reliable

identification." Ibid.

 In Lazo, supra, 209 N.J. at 21, the Court held that its

reasoning in Branch was not limited to the admission of

"prejudicial hearsay testimony," but "extend[ed] to testimony

about the identification process in general." The detective in

Lazo did not rely on information received; instead, he testified

that he included the defendant's photo in an array because he

believed the defendant matched the culprit. Id. at 22. The

admission of that testimony was still error, the Court concluded,

because the detective lacked personal knowledge of the attacker's

appearance and his testimony improperly "enhanced the victim's

credibility and intruded on the jury's role." Ibid.

 We reach the same conclusion with respect to the testimony

describing why defendant's photo was placed in the array shown to

Maria and Miguel in November 2011. Detective Tuohy's suspicion

was the obvious reason the photo was included. He and Detective

Valera explained that after the surveillance stills were sent out,

Detective Tuohy responded that he believed defendant was the man

depicted. Detectives Rivera and Valera testified that afterwards,

they suspected defendant as well, and ultimately included his

photo in the array. Although Detective Tuohy obliquely stated

that he knew defendant "through dealings" in the township, the

 16 A-4392-13T3
inference was inescapable that defendant's interaction with law

enforcement was not benign, and arose because of "defendant's

prior criminal conduct." Tilghman, supra, 345 N.J. Super. at 578.

For example, if Detective Tuohy knew defendant because he coached

him on the Police Athletic League baseball team, he presumably

would have said so.5

 It is also of no moment that, unlike the detective in Lazo,

Detective Tuohy actually knew defendant. The Court has clearly

held that the reason a defendant's photo is included in an array

is irrelevant. See Lazo, supra, 209 N.J. at 12-13. "The only

relevant evidence [is] the identification itself." Id. at 21

(quoting Branch, supra, 182 N.J. at 348).

 The error regarding the origins of the photo array was

compounded by the improper admission of the Perth Amboy detectives'

lay opinion that the man depicted in the video was defendant. 6 A

lay witness may testify "in the form of opinions or inferences"

if "rationally based on the perception of the witness" and if the

5
 Additionally, while the judge did provide a limiting instruction
stating that photos of defendant could be derived from a variety
of sources and that the jury could not consider them as evidence
of having been arrested or convicted of a crime, this instruction
merely cured speculation arising from the source of defendant's
photo. It did not cure the testimony from Detective Tuohy that
he knew defendant and had photos of him based on prior dealings.
6
 We do not address the propriety of allowing Detective Tuohy to
identify defendant, as defendant does not challenge that on appeal.

 17 A-4392-13T3
testimony "will assist in understanding the witness' testimony or

in determining a fact in issue." N.J.R.E. 701. "[T]estimony in

the form of an opinion, whether offered by a lay or an expert

witness, is only permitted if it will assist the jury in performing

its function." State v. McLean, 205 N.J. 438, 462 (2011). "The

Rule does not permit a witness to offer a lay opinion on a matter

. . . as to which the jury is as competent as he to form a

conclusion[.]" Id. at 459 (internal quotation marks and citation

omitted). Furthermore, a police witness is not permitted to offer

an opinion regarding a defendant's guilt. State v. Frisby, 174

N.J. 583, 593-94 (2002) (disapproving police testimony that opined

regarding innocence of one person and inferentially the guilt of

the defendant); State v. Landeros, 20 N.J. 69, 74-75 (1955)

(holding that police captain's testimony that defendant was "as

guilty as Mrs. Murphy's pet pig" caused "enormous" prejudice

warranting reversal).

 These principles apply to opinions regarding an offender's

identity. "In an identification case, it is for the jury to decide

whether an eyewitness credibly identified the defendant." Lazo,

supra, 209 N.J. at 24. A police officer may not "improperly

bolster or vouch for an eyewitness' credibility and thus invade

the jury's province." Ibid.

 18 A-4392-13T3
 The Lazo Court reviewed federal authority on whether a lay

police witness may opine that a defendant is depicted in a crime

scene photograph. The Court noted that one federal court held

that a lay opinion "is permissible where the witness has had

sufficient contact with the defendant to achieve a level of

familiarity that renders the lay opinion helpful." Id. at 22

(internal quotation marks and citation omitted). Whether the

opinion is helpful in turn depends on the witness's knowledge of

the defendant's appearance at the time of the crime, the

defendant's dress, and "whether the defendant disguised his

appearance during the offense or altered her looks before trial,

and whether the witness knew the defendant over time and in a

variety of circumstances." Ibid. (internal quotation marks and

citation omitted). "[C]ourts recognize that when there is no

change in defendant's appearance, juries can decide for themselves

— without identification testimony from law enforcement — whether

the person in a photograph is the defendant sitting before them."

Id. at 23.

 The Court cited a decision finding it error to admit an

officer's opinion that a defendant was depicted in a bank

surveillance photo where the officer's opinion "was based entirely

on his review of photographs . . . and witnesses' descriptions

. . . ." Ibid. (internal quotation marks and citation omitted).

 19 A-4392-13T3
Another factor in determining whether to permit a lay opinion on

identification is "whether there are additional witnesses

available to identify the defendant at trial." Ibid.

 With this authority in mind, the Lazo Court held it was error

to permit a detective to testify he believed the defendant's arrest

photo closely resembled a composite sketch that was based on the

victim's description of her assailant. Id. at 24. The detective

did not witness the crime; did not know the defendant; and relied

solely on the victim's description. Ibid. "Nor was there a change

in appearance that the officer could help clarify for the jurors;

they could have compared the photo and the sketch on their own.

Finally, the sole eyewitness told the jury what he observed

firsthand." Ibid.

 Applying these principles, we conclude it was improper for

Detectives Valera and Rivera to opine that defendant was the man

depicted in the video, and, in Detective Rivera's case, to opine

regarding the ultimate issue that defendant committed the assault

against Maria. In particular, at various points in the playback

of the video footage at trial, Detective Valera was permitted to

assert that the person depicted was defendant. Detective Rivera

was permitted to testify that defendant was depicted in stills

from the video. Furthermore, she was permitted to opine on

defendant's guilt, by responding that defendant was the

 20 A-4392-13T3
perpetrator of the crime. Yet, neither detective had any contact

or familiarity with defendant before the assault. Their opinions

were clearly affected by Detective Tuohy's opinion. The Perth

Amboy detectives were no more competent than the jury to scrutinize

the video, the 2011 photos, and defendant — who sat before them

for several days — to determine whether defendant was the man in

the video.

 The evidence that defendant may have put on weight between

the time of the attack and the trial does not alter our analysis.

First, the evidence was not uncontroverted that defendant gained

weight after the attack. Perhaps, he never was as slim as the

attacker. Maria described her attacker as lanky, and Miguel

believed he weighed between 125 and 130 pounds. The evidence was

far from conclusive that defendant's weight was in that range in

September 2011. Indeed, the incongruities in the weight-related

evidence raise questions about its reliability. According to a

November 2011 medical record, defendant reportedly weighed 146

pounds — which is roughly twenty pounds more than the range Miguel

described. And, when he was arrested the next month, his weight

was reportedly twenty-two pounds more, and it remained close to

that a year later according to another medical record.

 Second, even assuming defendant gained weight between 2011

and the time of trial — which was in March 2013 — the State did

 21 A-4392-13T3
not establish that the detectives were more competent than the

jurors to ascertain whether defendant was the man in the video.

Detective Rivera may have been competent to testify that the

heavier person in the courtroom looked like the person she met at

a bus stop in November 2011, and Detective Valera may have been

competent to testify that the man in the courtroom resembled the

person he arrested in December 2011. They may also have been

competent to testify that Detective Tuohy's photographs, or

Detective Rivera's bus-stop photographs, depicted defendant.

However, that was not at issue. The issue was whether defendant

was the man in the video. As to that question, the detectives

were not significantly more capable than the jury to form a

conclusion.

 Furthermore, the fact that defendant wore glasses at trial

did not justify admitting the detectives' opinion. Wearing glasses

did not constitute a major change in defendant's appearance. In

any event, defendant repeatedly removed the glasses during the

trial when witnesses were asked to make an in-court identification.

 In sum, Detective Valera's and Detective Rivera's testimony

improperly "intruded on the jury's role." Lazo, supra, 209 N.J.

at 22.

 We next consider whether the court's admission of the

testimony regarding the origins of the photo array and of the

 22 A-4392-13T3
Perth Amboy detectives' identification of defendant constitutes

reversible error. Defendant raised the first issue at trial, but

not the second. Thus, we consider whether the first was harmless

error. See State v. J.R., 227 N.J. 393, 417 (2017) ("An

evidentiary error will not be found 'harmless' if there is a

reasonable doubt as to whether the error contributed to the

verdict."); see also Lazo, supra, 209 N.J. at 26 ("The harmless

error standard requires that there be some degree of possibility

that [the error] led to an unjust result. The possibility must

be real, one sufficient to raise a reasonable doubt as to whether

[it] led the jury to a verdict it otherwise might not have

reached." (internal quotation marks and citation omitted)).

 The second error is subject to a plain error standard of

review. Under that standard, "defendant has the burden of proving

that the error was clear and obvious and that it affected his

substantial rights." State v. Koskovich, 168 N.J. 448, 529 (2001)

(internal quotation marks and citation omitted); see also State

v. Williams, 168 N.J. 323, 336 (2001) (stating that, under plain

error standard, "a defendant . . . must demonstrate . . . the

error possessed a clear capacity for producing an unjust result"

that is, one "sufficient to raise a reasonable doubt as to whether

the error led the jury to a result it otherwise might not have

reached." (internal quotation marks and citation omitted)).

 23 A-4392-13T3
Whether an error is clearly capable of producing an unjust result

"depends on an evaluation of the overall strength of the State's

case." State v. Nero, 195 N.J. 397, 407 (2008) (quoting State v.

Chapland, 187 N.J. 275, 289 (2006)).

 Applying these two standards, we are convinced that the photo

array testimony was not harmless, and defendant has met his burden

as to plain error. As noted, the trial centered on the issue of

identification. The video surveillance did not clearly depict the

attacker. There was no forensic evidence. The eyewitnesses'

testimony was questionable. Although Maria said she was certain

defendant attacked her, her physical description of the

assailant's age, height and weight did not match defendant's

physical characteristics. The defense also questioned whether

Maria got a good look at her attacker's face.

 Miguel was only seventy percent certain of his in-court

identification, and fifty-to-seventy percent certain of his out-

of-court identification, although he told a detective on the day

of the attack that he was sure he could recognize the assailant.

Miguel's physical description also did not completely match

defendant. Furthermore, defendant presented an alibi.

 The photo array testimony, the Perth Amboy detectives'

identification, and Detective Rivera's opinion regarding guilt,

constituted weighty evidence. The importance of Detective

 24 A-4392-13T3
Rivera's identification was reflected in the State's emphasis of

it in summation. Given the high regard that jurors may have for

the opinions of police officers, our Court has recognized the

substantial prejudice that may befall a defendant if an officer

is permitted to offer a personal opinion of defendant's guilt.

See Landeros, supra, 20 N.J. at 74-75. Similar harm occurs when

an officer provides improper testimony about the origin of a photo

array, see Branch, supra, 182 N.J. at 353-54 (finding plain error

because officer's testimony that defendant was a suspect "based

on information received" could have "tipped the scales" as there

was no physical evidence linking defendant to scene and the

evidence was "far from overwhelming"), or provides an

identification that usurps the difficult task assigned to the

jury, see Lazo, supra, 209 N.J. at 24, 27.

 In sum, we are constrained to reverse based on the admission

of testimony regarding the origins of the photo array, and the

Perth Amboy detectives' identification of defendant.

 III.

 We add only brief comments on remaining issues to guide the

trial court in the event of a retrial.

 25 A-4392-13T3
 We discern no error in the court's admission of defendant's

phone conversation with his mother about eyeglasses.7 It was for

the jury to determine whether defendant — despite evidence of

twenty-twenty vision — wore glasses to interviews, perhaps to make

himself look studious; or whether he was concocting a means of

distinguishing himself from the attacker that the eyewitnesses

described — which may have demonstrated a consciousness of guilt

or merely an effort to look less like the described assailant.

See State v. Mann, 132 N.J. 410, 422 (1993) (stating that a

defendant's post-charge conduct is admissible if it supports an

inference that the conduct "is evidence of consciousness of

guilt"). However, it was error for the court to omit the model

jury charge on consciousness of guilt. Id. at 420 (stating that

when a court admits evidence of post-crime conduct, "it must

instruct the jury carefully regarding the inferences the jury may

draw from that evidence"). We recognize that defendant did not

request the charge. In view of our disposition of other issues,

we need not determine whether the omission of the model charge

constituted plain error.

 We also conclude it was error to permit the State to challenge

defendant's mother's credibility with presentation of her twenty-

7
 There is no reasonable dispute that defendant's admission in the
conversation that he was in Perth Amboy was relevant.

 26 A-4392-13T3
three-year-old theft conviction. This, too, was not raised below

and would be subject to a plain error analysis but for our reversal

on other grounds. Although the then-applicable version of N.J.R.E.

609 did not draw any time limits on the use of prior convictions,8

our Court has long recognized a conviction's remoteness weakens

its probative force, which then may be substantially outweighed

by the prejudice to the party against whom the conviction is used.

State v. Sands, 76 N.J. 127, 144-45 (1978) ("The trial court must

balance the lapse of time and the nature of the crime to determine

whether the relevance with respect to credibility outweighs the

prejudicial effect to the defendant.").

 We have found no authority — and the State has provided none

— for the proposition that a twenty-three-year-old third-degree

conviction is sufficiently probative of a lack of credibility so

as to outweigh its prejudicial effect. Cf. State v. Murphy, 412

N.J. Super. 553, 565 (App. Div.) (finding seventeen-year-old drug

possession conviction too remote), certif. denied, 202 N.J. 440

(2010); State v. Leonard, 410 N.J. Super. 182, 186-89 (App. Div.

2009) (affirming exclusion of fifteen-year-old conviction of

State's witness), certif. denied, 201 N.J. 157 (2010). Also,

8
 The revised version effective in 2014 establishes a heightened
burden for the proponent of evidence of a prior conviction over
ten years old. N.J.R.E. 609.

 27 A-4392-13T3
there was no evidence of any intervening convictions that might

have mitigated the extreme remoteness of Ms. Green's conviction.

Sands, supra, 76 N.J. at 145 ("If a person has been convicted of

a series of crimes through the years, then conviction of the

earliest crime, although committed many years before, as well as

intervening convictions, should be admissible.").

 The error was exacerbated in two ways. The State improperly

elicited that Ms. Green was found to have violated probation,

which is not a conviction and, accordingly, not admissible under

N.J.R.E. 609 irrespective of its remoteness. State v. Jenkins,

299 N.J. Super. 61, 75 (App. Div. 1997) ("Since a probation

violation is not a criminal conviction, it cannot be used for

impeachment purposes under N.J.R.E. 609."). And the State in

summation juxtaposed Ms. Green's record with the victim's "who

ha[d] no conviction, no convictions for trying to deceive anyone."

That commentary was improper; there was no evidence of the victim's

lack of a record, and, in any event, a party may generally not

bolster a witness's character for truthfulness with evidence of

specific instances of conduct. N.J.R.E. 405; see State v. Scott,

___ N.J. ___, ____ (2017) (slip op. at 21).

 Finally, with respect to the defendant's sentence, we agree

that the court did not identify facts independent of the elements

of the crime in finding that aggravating factor one applied.

 28 A-4392-13T3
N.J.S.A. 2C:44-1(a)(1) (requiring the court to consider "[t]he

nature and circumstances of the offense, and the role of the actor

therein, including whether or not it was committed in an especially

heinous, cruel, or depraved manner"); State v. Fuentes, 217 N.J.

57, 77 (2014) (remanding for resentencing where trial court did

not identify competent and credible evidence in the record — aside

from that which was necessary to prove the elements of the offense

— in finding aggravating factor one). If the defendant is retried,

found guilty and resentenced, the court shall reconsider its

application of aggravating factor one.

 Reversed and remanded. We do not retain jurisdiction.

 29 A-4392-13T3