**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1253-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DENNIS F. RODRIGUEZ, a/k/a
DENNIS FELIX, EDDIE NEVES,
and JOSE CRUZ,

     Defendant-Appellant.

_____

Submitted February 14, 2019 – Decided May 13, 2019

Before Judges O'Connor and Whipple.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 17-01-0094.

Joseph E. Krakora, Public Defender, attorney for appellant (Cody Tyler Mason, Assistant Deputy Public Defender, of counsel and on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel J. Marzarella, Deputy Executive Assistant Prosecutor, of counsel; John C. Tassini, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Dennis Rodriguez appeals from a September 15, 2017 judgment of conviction. A jury convicted defendant of second-degree robbery, N.J.S.A. 2C:15-1(a)(1), and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7), stemming from the robbery of seventy-six-year-old N.R.[1] For the reasons that follow, we reverse and remand for a new trial.

The key issue at trial was identification. On November 8, 2016, N.R. entered a bathroom stall in a Lakewood bus terminal and felt a tap on his shoulder. When he turned around, someone punched him in the face, and he fell to the ground. N.R. felt the assailant take his wallet from his back pocket. When N.R. got up, he exited the bathroom and alerted the bus terminal's security guard, J.R. The two followed the assailant outside, but the assailant walked behind a bus and down a street before they could identify him. Neither pursued the assailant.

Detective Gerald D'Alessio, of the New Jersey Transit Police Department, reviewed surveillance footage from the bus terminal's lobby and depot. D'Alessio generated several still photographs from the video and sent the photos to the Lakewood police before responding to the scene. The Lakewood police

---

[1] We use initials to protect the victim's and witness's privacy.

distributed the photos to the bus terminal security staff, and M.G., a security guard who was not working on the date of the robbery, recognized defendant in the still photographs because he frequented the bus terminal. M.G. confirmed his suspicions after visiting Mugshots.com and informed D'Alessio he believed defendant to be the robbery suspect.[2]

On November 9, 2016, the day after the robbery, Detective Chase Messer generated a random photo lineup. Messer handed the lineup off to Detective William Sweeny, who was unaffiliated with the investigation, and Sweeny showed the lineup to J.R. The process was video recorded. J.R. selected defendant as the man he saw exit the terminal.

On November 21, 2016, Messer generated another lineup and handed it off to Detective Steven Costain, who was also unaffiliated with the investigation, to show N.R. The interview was video recorded. N.R. was shown six photographs and said the picture of defendant "look[ed] like the closest, the best, the closest to the guy." Costain asked N.R. how confident he was, and N.R. responded, "[u]m, towards the good, [ninety] be close to being it, [ninety-five] will be close to being him . . . I'm [ten], [ten] or [twenty] or [thirty] percent

---

[2] M.G. was permitted to testify he recognized defendant but was not permitted to reference Mugshots.com.

left that its no, it's not." N.R. continued, "[o]ne to a hundred, I would say this, [thirty] to [thirty-five]," to which Costain asked, "[thirty] to [thirty-five] percent, you think that's him?" N.R. responded, "[thirty] percent, that's the closest, though of all." N.R. kept asking Costain whether the photo of defendant "was his true color" and said, "[b]ecause if this is the true color, definitely no cause he's a little dark." Costain tried to confirm N.R.'s final answer and asked, "so none of these guys you would say a hundred percent?" to which N.R. answered, "[n]o." Costain then told N.R. he was going to mark the box "no positive identification was possible." As the interview was finishing, N.R. said, "[i]f you can find out if that's the true color, 'cause he's dark skinned like I, that where I showed you . . . . Definitely if that's the true color, it will never be him. No way. 99.99999999, about the forty thousand nine's, that's the best."

Defendant moved to suppress both N.R.'s and J.R.'s identifications and sought a Wade[3] hearing. The trial judge watched both videos and found neither identification impermissibly suggestive under State v. Henderson, 208 N.J. 208 (2011). Both identifications were played for the jury.

---

[3] United States v. Wade, 388 U.S. 218 (1967).

At trial, D'Alessio testified about the verbal description of the assailant N.R. gave to him. D'Alessio testified N.R described the assailant as "[six]-foot, [two]-inches tall," "250 to 275 pounds," "had a dark complexion," and was wearing "a blue coat" and "white pants." On cross-examination, N.R. was asked if he "remember[ed] telling the police the man had a blue coat?" N.R. responded, "[h]e had some kind of bluish, grayish clothing." N.R. was then asked, "[a]nd do you remember telling the police that he had white pants?" to which N.R. answered, "[t]hat, I don't remember. I'm sorry. . . . I said he had white pants?"

Officer Kevin Donnelly, who responded to the scene, testified that N.R. described the assailant "as a Hispanic male . . . approximately [six] feet tall, short, wavy, dark . . . black hair" and "was wearing a gray sweatshirt and blue jeans."

On direct examination, D'Alessio testified in a narrative format as to what he believed the security footage depicted while the prosecutor played the video for the jury. D'Alessio's knowledge of what the security footage showed was based on his review of the footage during his investigation of the robbery and interviews with the witnesses. However, D'Alessio responded to the bus

5

terminal after the robbery, and he did not know or interact with defendant before or during his investigation.

The State sought to have D'Alessio identify N.R. and defendant on the video, and the following exchange took place:

> [Prosecutor]: Can you describe what you see on the right-hand upper corner?
>
> [D'Alessio]: You see the victim walking with two other individuals.
>
>     . . . .
>
> [Prosecutor]: [D]o you know the name of that individual?
>
> [D'Alessio]: [N.R.]
>
> [Prosecutor]: And the other individual who is walking in close proximity but not with him, can you describe who that is?
>
> [D'Alessio]: That's [defendant] Dennis Rodriguez.

The prosecutor did not ask D'Alessio how he knew the man depicted in the video was defendant. D'Alessio testified N.R. walked to the bathroom, was followed by defendant, and defendant exited the bathroom and bus terminal before N.R. Next, D'Alessio explained how N.R. emerged from the bathroom holding his face and alerted J.R. The video then showed N.R. and J.R. step

6

outside the bus terminal, and, when asked what the video depicted, D'Alessio said, "[we] [s]ee [J.R.] looking for an individual that [N.R.] had described to him had just assaulted and robbed him." The video was played for a second time during jury deliberations without narration.

The trial judge explained to the jury its essential role as fact-finders by saying, "[y]ou and you alone are the sole and exclusive judges of the evidence, of the credibility of the witnesses and the weight to be attached to the testimony of each witness." The trial judge also listed several factors to consider when assessing the credibility of a witness, including "the extent to which, if at all, each witness is either corroborated or contradicted, supported or discredited by other evidence" and "whether the witness made any inconsistent or contradictory statement." The jury charge included specific in-court and out-of-court identification instructions. The jury found defendant guilty. Defendant was sentenced to a ten-year term of imprisonment with an eighty-five percent parole ineligibility period pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. This appeal followed.

On appeal, defendant raises the following points:

> I.   REVERSAL IS REQUIRED BECAUSE THE TRIAL COURT ERRED IN NOT SUPPRESSING EVIDENCE OF AN ATTEMPTED IDENTIFICATION AND BY

DECLINING TO HOLD A TESTIMONIAL HEARING ON THAT EVIDENCE AND ANOTHER WITNESS'S IDENTIFICATION.

    A.    Evidence of the Attempted Identification Should Not Have Been Admitted Because Its Limited Probative Value Was Substantially Outweighed by the Risk of Prejudice and Jury Confusion.

    B.    The Trial Court Erred in Not Holding a <u>Wade</u> Hearing Given the Evidence of Suggestiveness Regarding Both Photo Array Procedures.

II.    REVERSAL IS REQUIRED BECAUSE THE STATE'S CASE WAS BOLSTERED BY INADMISSIBLE HEARSAY AND OPINION TESTIMONY, AND IMPROPER COMMENTS MADE BY THE PROSECUTOR. (NOT RAISED BELOW)

    A.    The Trial Court Committed Plain Error by Allowing the State to Bolster Its Case with Inadmissible Hearsay Testimony from Two Investigating Officers.

    B.    The Trial Court Committed Plain Error by Allowing a Detective to Narrate the Surveillance Video.

    C.    The Prosecutor Committed Reversible Misconduct When She Repeatedly Appealed to the Jury's Emotions.

III.    THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO CHARGE THE JURY ON PRIOR INCONSISTENT

STATEMENTS, CHARGED ATTEMPTED THEFT AS A BASIS FOR ROBBERY WITHOUT EVER PROPERLY DEFINING ATTEMPT, AND ONLY CHARGED SIMPLE ASSAULT WITH ATTEMPTED BODILY INJURY AS A LESSER OFFENSE OF AGGRAVATED ASSAULT. (NOT RAISED BELOW)

A.    The Trial Court Committed Plain Error When It Failed to Instruct the Jury on Prior Inconsistent Statements.

B.    The Trial Court Committed Plain Error When It Charged the Jury on Attempted Theft as a Predicate for Robbery Without Defining Attempt.

C.    The Trial Court Committed Plain Error When It Failed To Charge the Jury on the Lesser-Included Offense of Simple Assault Involving Bodily Injury.

IV.    THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL AND WARRANTS REVERSAL OF HIS CONVICTIONS. (NOT RAISED BELOW)

V.    DEFENDANT IS ENTITLED TO AN ADDITIONAL DAY OF JAIL CREDIT FOR THE DAY HE WAS ARRESTED.

I.

We review a trial court's evidentiary determinations under an abuse-of-discretion standard.  State v. Perry, 225 N.J. 222, 233 (2016).  An abuse of

discretion occurs when a trial court's evidentiary ruling "was so wide of the mark" as to result in "a manifest denial of justice" and the evidence diverts the jurors from a reasonable and fair evaluation of guilt or innocence. State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)); State v. Moore, 122 N.J. 420, 467 (1991). Errors not objected to at trial are reviewed for plain error. R. 2:10-2; State v. Macon, 57 N.J. 325, 333 (1971).

D'Alessio's narrative testimony of the security footage, particularly the identification of defendant, was inadmissible lay opinion testimony. "Lay witnesses may present relevant opinion testimony in accordance with Rule 701, which permits 'testimony in the form of opinions or inferences . . . if it . . . is rationally based' on the witness'[s] 'perception' and 'will assist in understanding the witness'[s] testimony or in determining a fact in issue.'" State v. Lazo, 209 N.J. 9, 22 (2012) (first and second alterations in original) (quoting N.J.R.E. 701). "The Rule does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion[.]'" State v. McLean, 205 N.J. 438, 459 (2011) (first, second, and fourth alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). "[L]ay opinion testimony is

10

limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460.

Lazo is instructive. There, our Supreme Court held a detective's testimony explaining why he included the defendant's picture in a photo array was inadmissible because the decision was based on a tip the detective received, not personal knowledge. 209 N.J. at 21-22. "In essence, the detective told the jury that he believed defendant closely resembled the culprit—even though the detective had no personal knowledge of that critical, disputed factual question." Id. at 22. This testimony was inadmissible because it improperly bolstered the victim's account and usurped the jury's responsibility to weigh the victim's credibility. Id. at 13, 22.

Lazo identified several factors to be considered before lay opinion identification testimony is admitted. Whether the opinion is "helpful" depends on the witness's familiarity with the defendant's appearance when the crime was committed, whether the defendant disguised his or her appearance during the offense or altered his or her appearance before trial, and "whether the witness knew the defendant over time and in a variety of circumstances." 209 N.J. at 22 (quoting United States v. Beck, 418 F.3d 1008, 1015 (9th Cir. 2005)). Courts should also consider whether there are additional witnesses available to identify

11

the defendant at trial.  Id. at 23.  "[W]hen there is no change in a defendant's appearance, juries can decide for themselves—without identification testimony from law enforcement—whether the person in a photograph is the defendant sitting before them."  Ibid.

Although we have not previously extended Lazo to the identification of a defendant on video surveillance, these principles apply.  D'Alessio's testimony exceeded the bounds of permissible lay opinion testimony.  He did not personally witness the crime nor did he have prior interactions with defendant. He based his testimony on his observation of the video and not on any personal knowledge.  As a result, D'Alessio was in no better position than was the jury to draw conclusions about what the video showed.

The State does not suggest defendant changed his appearance before trial such that his appearance in court was unrecognizable from that in the security footage.  Nor does the State explain why J.R. did not testify as to what the security footage depicted based on his personal knowledge of the events. Rather, D'Alessio's testimony merely served to bolster the credibility of N.R., who offered unreliable and inconsistent descriptions of the assailant.

Of equal concern is identification testimony lacking personal knowledge that introduces inadmissible hearsay testimony.  Hearsay testimony may lead

the jury to infer a police officer received information from an unknown source implicating the defendant in a crime, which is barred and its allowance is reversible error. State v. Branch, 182 N.J. 338, 349-51 (2005); State v. Irving, 114 N.J. 427, 444-48 (1989); State v. Bankston, 63 N.J. 263, 271 (1973). "[A] police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351. Such testimony is admissible only to rebut the defendant's suggestion the police arbitrarily identified the defendant as a suspect or acted with ill motive. Id. at 352.

On direct examination, the prosecutor asked D'Alessio "the next day [after the robbery], based on some information about a possible identification of Mr. Rodriguez as the person being in the still, did you have a photo array conducted? [A]: Yes." (Emphasis added). The source of the information was M.G. M.G. testified, but explained he told Officer Brooks of the Lakewood Police Department, who circulated the still photographs, he recognized defendant. M.G.'s identification may have been relayed to D'Alessio, but the jury was never informed of this fact. It is unclear if this was the basis upon which D'Alessio identified defendant in the security video. Without knowing how D'Alessio was able to identify defendant, a juror could infer D'Alessio was privy to an unknown

source who implicated defendant in the crime. This was error capable of producing an unjust result. Based upon this, as well as D'Alessio's lay opinion testimony, we conclude defendant is entitled to a new trial.

II.

In light of our decision to grant defendant a new trial, we address only one more point raised by defendant on appeal: the suppression of N.R.'s and J.R.'s out-of-court identifications. We agree with the trial court that neither identification was impermissibly suggestive and affirm the trial court's order denying defendant's motion to suppress.

Defendant argues three elements of suggestiveness were present during N.R.'s identification: (1) only four fillers, not five, were included in N.R.'s array; (2) N.R. was permitted to view defendant's photo multiple times without looking at others; and (3) the administrator did not ask whether N.R. discussed the identification with others. As for J.R.'s identification, defendant takes issue with the fact Sweeny, who administered the identification process to J.R., did not elicit a statement of confidence in percentage form and failed to ask whether J.R. spoke with anyone about the identification.

Under Henderson, a defendant must make a threshold showing of suggestiveness before a trial court will consider whether an out-of-court

identification should be suppressed. <u>Henderson</u>, 208 N.J. at 288-89. <u>Henderson</u> divided the characteristics of an identification into two groups: system variables and estimator variables. <u>Id.</u> at 248-61, 261-72. System variables are those factors the State has control over, such as: (1) whether a "blind" or "double blind" administrator is used; (2) whether pre-identification instructions are given; (3) whether the lineup is constructed of a sufficient number of fillers that look like the suspect; (4) whether the witness is given feedback during or after the procedure; (5) whether the witness's confidence level was recorded before any confirmatory feedback was given; (6) whether the witness is exposed to multiple viewings of the subject; (7) whether a "showup" was used; (8) whether the administrator asked the witness if he or she had spoken with anyone about the identification; and (9) whether the eyewitness initially made no choice or chose a different suspect or filler. <u>Id.</u> at 289-91; <u>see also</u> <u>R.</u> 3:11. The defendant has the burden of showing some evidence of suggestiveness tied to a system variable, rather than an estimator variable. <u>Henderson</u>, 208 N.J. at 288-89. If no evidence of suggestiveness is produced, there is no need to consider estimator variables at the hearing because evidence of reliability is a fact issue. <u>Id.</u> at 290-91.

A-1253-17T4

If the defendant sustains the burden, a hearing will be granted and the burden shifts to the State to demonstrate the identification was reliable, "accounting for system and estimator variables." Id. at 289. Estimator variables include factors outside the State's control. Id. at 261-72. The defendant retains the burden to show a "substantial likelihood of irreparable misidentification." Id. at 289. If the defendant makes such a showing, the evidence should be suppressed. Ibid.

The Supreme Court's recent decision in State v. Anthony modified the Henderson framework. __ N.J. __ (2019) (slip op. at 23). Prior to this opinion, creation of an audio or visual recording of the out-of-court identification was highly suggested but not mandatory. Id. at 18 (discussing State v. Delgado, 188 N.J. 48 (2006)). After Anthony, a defendant must receive a Wade hearing if the police fail to "electronically record the identification procedure or prepare a contemporaneous verbatim account of the exchange[.]" Id. at 26. Here, both identifications were video recorded; thus Anthony does not alter our analysis.

In any event, we reject defendant's arguments concerning the perceived suggestiveness of N.R.'s and J.R.'s identifications. First, N.R.'s photo array contained five fillers, not four. Defendant rules out the first filler because the man in the first photo did not have hair, while the others did. But Henderson

did not lay down a strict requirement that the fillers' characteristics exactly match the witness's pre-lineup description. Henderson, 208 N.J. at 252. Rather, "fillers [should] generally fit the witness'[s] description and that [w]hen there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features." Ibid. (quotation omitted). The goal is to minimize the "pop-out effect." Id. at 251. Here, N.R. initially described the assailant "as a Hispanic male . . . with short, wavy, dark . . . black hair." It's true the first filler lacked hair, but he and the defendant both had similar facial hair, a rounded face, and were Hispanic. This satisfies Henderson's "general fit" requirement.

The fact N.R. viewed defendant's picture multiple times during the same sitting is not problematic. When Henderson discussed "multiple viewings," the Court was concerned about confirmation bias over the course of an investigation. Id. at 255-56. For example, confirmation bias may occur when a witness views a set of mugshots, makes no affirmative identification, but then selects someone depicted in the earlier photos in a later identification procedure. Ibid. Here, N.R. kept returning to defendant's photograph in the same sitting without interruption from the administrator. Henderson does not prohibit this.

A-1253-17T4

Defendant is correct the administrator never asked N.R. whether he spoke to anyone about identification of his assailant. In State v. Chen, the Supreme Court concluded a line-up was impermissibly suggestive because a witness was shown a photograph of a suspect by a co-witness. 208 N.J. 307, 314, 320-27, 328-29 (2011). Both Henderson and Chen were concerned about co-witness feedback, where one witness develops a false memory based on an image shown or a description given by a co-witness. However, here, defendant makes no specific allegation N.R. spoke with anyone about the identification before he made it. Defendant's burden is to show "some evidence of suggestiveness," and here, he fails to do so. Henderson, 208 N.J. at 288 (emphasis added).

Defendant's argument concerning the fact that J.R. was not asked if he spoke with anyone prior to making his identification fails for the same reason: defendant offers no evidence of suggestiveness. To be sure, Sweeny did ask J.R. whether he was "advised by anyone whether others had picked out any particular photo?" and whether he was "advised anything about any of the individual picture[s] in the display?" J.R. answered "[n]o" to both questions.

Defendant also argues J.R. was not asked to express how confident he was in selecting defendant's photo in percentage form. Sweeny asked, "[o]kay . . . you're identifying photo number [three]? . . . As the person that on November

the 8th you saw in the Lakewood . . . bus terminal; correct?" To which J.R. responded, "[y]es."

"[T]o the extent confidence may be relevant in certain circumstances," Henderson requires that a statement of confidence "must be recorded in the witness'[s] own words before any possible feedback." 208 N.J. at 254. The purpose of this requirement is to guard against confirmatory feedback. Id. at 253. Confirmatory feedback "occurs when the police signal to an eyewitness that they correctly identified the suspect" and "can distort memory." Id. at 253-54. However, neither Henderson nor Rule 3:11(c) require a statement of confidence, if relevant, to be given in percentage form.

Here, J.R. was asked to confirm he was selecting defendant's photo from the array. He answered "[y]es." That J.R. did not say "100%" is not evidence of suggestiveness. Defendant bears the burden of showing evidence J.R. received confirmatory feedback before giving his statement of confidence (or lack thereof) becomes suggestive, and here, defendant fails to do so.

Defendant also asserts N.R.'s out-of-court identification should have been excluded under Rule 403. N.J.R.E. 403. Pursuant to Rule 403, evidence should be excluded "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay,

waste of time, or needless presentation of cumulative evidence." Given our deferential standard of review of evidence rulings, we will only reverse upon a showing the trial court abused its discretion. State v. Kuropchak, 221 N.J. 368, 385 (2015).

Defendant asserts N.R.'s identification was so uncertain and unclear it had the propensity to mislead the jury. We disagree. Just because N.R.'s identification was uncertain does not necessarily mean it was confusing. Rather, it was in the jury's province to assess N.R.'s credibility. Indeed, N.R.'s uncertainty would appear to help, rather than hurt, defendant's case.

### III.

Defendant advances several other arguments concerning the content of the jury instructions, the prosecutor's opening and closing statements, and sentencing. In light of the fact we are granting defendant a new trial, it is unnecessary to address these arguments.

Reverse and remanded for a new trial consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION