**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2503-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

WENDELL JOHNSON,
a/k/a LAMAR HILL,

     Defendant-Appellant.

_____

Argued December 18, 2023 – Decided January 12, 2024

Before Judges Mawla and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-12-0746.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Simon Albert Wiener, Assistant Deputy Public Defender, of counsel and on the briefs; Elizabeth Cheryl Jarit, Deputy Public Defender, on the briefs).

Debra Grace Simms, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Debra Grace Simms, of counsel and on the brief).

Appellant filed pro se supplemental briefs.

PER CURIAM

Tried by a jury, defendant Wendell Johnson was convicted of aggravated arson. In this direct appeal, defendant argues for reversal of his conviction and sentence. We affirm.

## I.

In August 2018, a fire occurred at the Kiss of Ink Tattoo Shop in Trenton. On the day of the fire, at approximately 5:00 a.m., Joseph Matisa, the owner was alerted of the fire and immediately drove to the shop. Matisa found the fire department on the scene and the front of the building completely burnt. The rear area was damaged by smoke and water damage. Matisa was unable to connect to his own security cameras, so he asked a nearby business if he could review their security footage.

The footage showed the same man appearing in the adjacent alleyway and at the front door of the parlor multiple times throughout the early morning hours. The man was wearing a red shirt, long denim shorts, a black cloth cap, and a lanyard around his neck. The footage showed the individual gathering items from trash piles, placing them at the front of the building, carrying a gasoline

2

can, bending over the gathered pile with the gas can, and then running away shortly before smoke emerged and the fire began.

The Trenton Police Department issued a press release along with still frames from the video footage. Michael Traendly, defendant's parole officer, and Trenton Police Officer Corey McNair, defendant's cousin, both responded to the press release, identifying defendant as the person in the photograph. Additionally, defendant called Officer McNair and told him that the police were looking for him because of the photograph.

On December 13, 2018, defendant appeared before the trial court on this complaint and three other pending indictments. After referencing an October proceeding in which defendant had asked to be represented pro se, the trial court and defendant discussed proceeding in that regard.

The court began by ensuring defendant knew the penalties for the most serious charge he was facing, aggravated arson. Defendant correctly responded that if he lost at trial, he would be facing up to ten years in prison with up to five years without parole. Defendant also stated that depending on the damage caused by the fire, he could also face fines and penalties. Regarding charges on which he had already been indicted, defendant correctly stated that for his

3

violations of third-degree failure to register under Megan's Law[1], he was facing five years in prison and up to three years without parole. The court explained, for the separate indicted fourth-degree cases, defendant would be facing an additional eighteen months in prison.

The court then asked defendant about his education, and defendant replied that he had a GED and "had been practicing law for some time now." When the court inquired how defendant practiced law without a license, he explained he had represented himself many times. He described that he "had two of [his] motions granted here in Mercer County Court" and he "went through the appeal process and got the [No Early Release Act ("NERA")][2] eliminated" on prior armed robbery and aggravated assault charges. When the judge asked about NERA, defendant explained the eighty-five percent sentence was eliminated by this court and "remanded back for resentencing to substitute it by the Graves Act."[3]

---

[1]  N.J.S.A. 2C:7-19.

[2]  N.J.S.A. 2C:43-7.2.

[3]  N.J.S.A. 2C:43-6 (imposing mandatory minimum sentencing for certain offenses involving firearms).

A-2503-21

The court queried defendant's knowledge of the elements of aggravated arson, with defendant stating, "All right. I allegedly purposely set a fire onto a structure of private property." The court explained defendant was entitled to statutory defenses. Defendant replied that he was not indicted yet, but after the State submitted the matter to the grand jury, he would read the defenses and understand them. After defendant identified the lesser-included charge of third-degree arson, the court clarified there were other defenses he could raise. Defendant then correctly explained the reasonable doubt standard to the trial court.

When the court started to inform defendant on being bound by the Rules of Evidence, defendant interrupted and explained that he also had to follow the Code of Criminal Justice, and the Rules of Court, which he "read all the time." The trial court made clear that it was specifically concerned about the evidence rules because defendant would be bound by evidence rulings even if he did not understand them. The court went on to try and simplify what sections of the Court Rules applied to criminal proceedings, and defendant corrected the court, stating there are eight sections to the rules, but in criminal cases only "[o]ne through three and seven is municipal. Some municipal can be applied."

5

The court explained that by representing himself, defendant may not be able to get certain evidence admitted and the court could not help him with evidence or with presenting questions in the proper format. The court reiterated it was still concerned defendant may be waiving some defenses he was not aware of. Defendant then asked the court for standby counsel to help him with subpoenas and the filing of motions, which defendant acknowledged would depend on what happened at grand jury proceedings. The trial court again explained to defendant the pitfalls of representing himself, including that it can be difficult to choose whether or not to testify and the challenges that might present. Defendant was also informed that if convicted, he would not be able to raise any ineffective assistance of counsel claims on appeal or post-conviction relief.

Throughout the proceeding, the trial court suggested numerous times that defendant have counsel and warned of the drawbacks he would face in representing himself because he was not trained in the law. The court explained an attorney was trained in the law, but defendant had only "jailhouse knowledge[,]" and would be better represented by an attorney. Although he was told multiple times it was not a good idea to represent himself, defendant remained steadfast in his quest. The court then granted defendant's motion.

6

Afterwards, the State pointed out defendant was eligible for an extended term as a persistent offender.[4] The court asked defendant if he was concerned about being sentenced to those enhanced penalties, to which defendant replied, "No, I've been in trial three times already." The court concluded by telling defendant, "I'm not satisfied that you're making the correct decision, but that's your decision to make[,]" and appointed standby counsel. On December 21, 2018, a grand jury indicted defendant on one count of second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(2).

Defendant engaged in extensive pre-trial motion practice. He challenged the legitimacy of the complaint warrant and corresponding indictment, including allegations the prosecutor presented evidence of defendant's prior convictions to the grand jury. He moved for a new detention hearing, arguing a material change in his circumstances. He tried to dismiss the indictment for the prosecution's alleged failure to instruct the grand jury on defenses and justifications. He moved for dismissal for prosecutorial misconduct through selective prosecution.

---

[4] N.J.S.A. 2C:44-3(a) (permitting imposition of an extended sentence where defendant has been previously convicted on at least two other separate crimes within the last ten years).

A-2503-21

At one pre-trial hearing, defendant asked to speak with the State's attorney without his standby counsel.  The court advised defendant, "That's fine and what I'm going to caution you, again, which I cautioned you at the time of the hearing where I said that you could represent yourself, is that anything you say may impact on your ability to, let's say, cross examine yourself."  Defendant responded, "Absolutely.  I could be incriminating in the pitfalls and all and the dangers and all that good stuff.  I'm aware of that."

The trial began in March 2020.  The State's first witness was Matisa.  He testified when he reviewed the security footage, he saw the same person multiple times.  The man was wearing a red shirt, long denim shorts, a black cloth cap, and a lanyard around his neck.  Matisa did not recognize the individual but observed him "stop[ping] in front of [Matisa's] business multiple times, bring[ing] objects to and from and all that . . . ."  To Matisa, "[i]t looked like the person was taking–right away in the video you watch cardboard and–or wood directly from where the trash was in the sidewalk and in front of the business and then there's footage of the person leaving with a gas can as well."  During Matisa's testimony, still photographs from the surveillance footage were entered into evidence without objection.

8

Detective Gregory Hollo also testified for the State about the surveillance footage that was retrieved. When Detective Hollo was asked to describe a portion of the footage, the following occurred:

> [DETECTIVE HOLLO]: Basically, the individual, Wendell Johnson, again walking from the area of Franklin Street towards the –
>
> [STANDBY COUNSEL]: Excuse me, I— Judge, I didn't quite hear what the witness was saying.
>
> [DETECTIVE HOLLO]: The individual is—known as—we knew as Wendell Johnson walking from Franklin Street towards the tattoo shop.
>
> [STATE]: Okay.
>
> [STANDBY COUNSEL]: I'm going to object to the reference of Wendell Johnson.
>
> THE COURT: Sustained.
>
> [STANDBY COUNSEL]: I didn't hear him the first time. It might have been said two or three different times (indiscernible) reference to the individual standing—sitting to my right as well (indiscernible)[.]
>
> THE COURT: Sustained.

Detective Hollo then testified the video depicted an individual walking along the alleyway, carrying an item that looks like a "[r]ed plastic gas can with a black spigot—a plastic spigot." Detective Hollo stated based on the subject's

9

clothing, size, shape, and relative features, it seemed to be the same person that passed in front of that same camera angle two times earlier in the morning.

Detective McNair also testified for the State and explained defendant was his cousin and he had known defendant for his entire life. He knew him by two names: Lamar Hill and Wendell Johnson. He testified that in a photograph taken during the summer of 2018, defendant was wearing clothing like that seen in the still frame from the security footage.

Detective McNair further testified to receiving a phone call from defendant, who stated he knew the police were looking for him based on the circulated photographs. Defendant asked Detective McNair to accompany him and his attorney to the police station so defendant could turn himself in. After the call ended, Detective McNair immediately contacted his supervisor and reported the phone call. On cross-examination, defendant asked Detective McNair about their family relationships, establishing defendant's mother, Detective McNair's aunt, also used the surnames Hill and McNair.

Parole Officer Traendly also testified for the State. Officer Traendly did not reference his job as a parole officer, but testified he had known defendant for approximately a year, had interacted with him "ten times[,]" which would last "[a]nywhere from a few minutes to upwards [of] an hour or two." Traendly

10

testified he responded to the press release after identifying defendant, noting the clothing, hat, and lanyard in the photograph were the same defendant wore during Traendly's most recent interaction with him.

Detective Marc Masseroni from the Mercer County Prosecutor's Office testified for the State. The detective testified to reviewing the security footage, which was already in evidence. Detective Masseroni testified the individual on the surveillance video was "walking up with, what appears to be, some kind of container in his right hand, walking across the street towards [the parlor]." Detective Masseroni testified the footage showed the individual leaning over the front door of the parlor and its stoop and later standing towards the iron gate to the alleyway. The following testimony then ensued:

> [STATE]: Can you describe what you just observed that individual doing?
>
> [DETECTIVE MASSERONI]: That individual extended his arm, turned his arm upside down, with his thumb facing down, almost indicating that he was either pouring something out, or turning his hand upside down, with the container that was in his hand.

As the video continued, Detective Masseroni testified, it "[l]ooked like he attempted to ignite something towards the base of the front door, as well as, possibly, towards the middle, a couple times, pulled away from it quickly, and started running . . . ." Defense counsel objected to this testimony as speculative,

11

and at sidebar argued it was the jury's place to determine what the individual in the video was doing. The court instructed, "I think you just need to— just have him keep his responses strictly to what action he observes." Defense counsel did not request, and the court did not give, any curative instruction.

Defendant re-called Detective Hollo and presented him with a report showing Wendell Johnson's and Lamar Hill's phone numbers were different. After the defense rested, the court reviewed the final jury charge and the jury sheet with the parties. Defendant stated he had no objection to either.

After summations, the court charged the jury. At sidebar, the court asked if there were any objections to the jury charge, and there were none. The court also offered for counsel to make sure all the evidence was in order.

During deliberations, the jury requested playback of the video, including pausing on specific frames and enlarging portions showing the individual walking and running. The jury returned a unanimous guilty verdict on the charge of aggravated arson.

After the jury was dismissed, Juror Number Two contacted the court's chambers. With defendant and State's attorney's present, and standby counsel on the telephone, the court called the juror in for discussion on the record. The following exchange ensued:

THE COURT: —was there any outside influence that would have—that created . . . —your phone call to my chambers after you agreed with the verdict, as it was announced by the foreperson?

JUROR NO. 2: No. I actually, all along going in, they kind of swayed me to, in a way, in there. I was the only one who said not guilty, and it was kind of a swayed decision and then I wanted to come out and feel—

THE COURT: But did —nobody twisted your arm or forced you—

JUROR NO. 2: No.

THE COURT: —to do anything—

JUROR NO. 2: No, no, no.

THE COURT: —that you didn't want to do?

JUROR NO. 2: No, no.

THE COURT: And there was no outside influence—

JUROR NO. 2: No, no.

THE COURT: —from outside of the courtroom

JUROR NO. 2: No.

Post-trial, defendant continued motion practice, including that the indictment should be dismissed for technical violations, that a new trial was warranted because of various procedural and substantive violations, prosecutorial misconduct, and that standby counsel was able to sit too close to

13

him in violation of covid protocols, which delayed his sentencing date multiple times. The court denied defendant's motions, stating, "None of these allegations separate or together diminish the evidence . . . upon which [d]efendant . . . was convicted." Defendant had not "offered sufficient newly discovered evidence upon which the court could grant a new trial[,]" and the motion was untimely under Rule 3:20-2. The trial court wrote it "carefully considered [defendant's] nine points presented both in his moving papers and reiterated during oral argument[,]" but found they were "not sufficient to overcome the evidence and the rational inferences drawn from the evidence which were presented to the grand jury."

Prior to sentencing, defendant was ordered to undergo a psychological examination for the purposes of mitigation for sentencing, which defendant refused. At defendant's March 4, 2022 sentencing hearing, his remaining post-trial motions were dismissed. The State argued for an extended sentence as a persistent offender. Defendant argued his prior convictions should not be considered because they either had procedural defects, were a result of a guilty plea, or were pending appeal. Defendant also argued his mental illness should protect him from receiving an extended term. The State responded defendant's

illness appeared to be self-reported and only raised selectively. The State emphasized defendant was found competent to represent himself at trial.

Although the court found defendant eligible for an extended term as a persistent offender, it declined to sentence him in that manner. The judge did consider defendant's proffered mental health records, stating, "defendant may have some psychological disorder or ailment that might affect his ability to make decisions." After careful review of the presentencing report, aggravating and mitigating factors, and the weight accorded to each, defendant was sentenced to ten years, subject to NERA, and a subsequent three years of parole supervision, plus fines and penalties. At sentencing, defendant's three other indictments were dismissed by the State.

On appeal, defendant raises the following issues:[5]

> POINT I: THE TRIAL COURT ERRED BY
> CONCLUDING [DEFENDANT] KNOWINGLY

---

[5] After defense counsel filed their appellate brief, defendant asked to represent himself at oral argument while still relying on the attorney's brief, maintaining that his December 2018 waiver of counsel before the trial court should apply to his appellate proceedings. On November 23, 2022, we denied defendant's motions to waive representation and proceed pro se at oral argument. On January 5, 2023, defense counsel moved to be relieved. On January 9, 2023, we ordered a limited remand for a hearing pursuant to State v. Coon, 314 N.J. Super. 426 (App. Div. 1998), on the validity of defendant's waiver of right to counsel on appeal. On February 16, 2023, at the Coon hearing, defendant withdrew his motion to waive appellate counsel. We then vacated the order for limited remand, and the matter proceeded.

WAIVED HIS RIGHT TO COUNSEL BECAUSE IT QUIZZED HIM ABOUT HIS LEGAL KNOWLEDGE AND DID NOT EXPLICITLY TELL HIM THE NECESSARY INFORMATION.

    A. The Court Quizzed [Defendant] about His Knowledge of Criminal Procedure Rather than Tell Him about the Required Topics

    B. The Court Did Not Tell [Defendant] about the Nature of the Charge: Its Elements and Lesser Included Offenses.

    C. The Court Did Not Tell [Defendant] about Statutory Defenses He Could Raise.

POINT II: DETECTIVE MASSERONI'S NARRATION OF SECURITY FOOTAGE AND DETECTIVE HOLLO'S IDENTIFICATION OF THE PERSON IT DEPICTED IMPERMISSIBLY INFRINGED ON THE JURY'S FUNCTION.

In his pro se brief, defendant raises the following additional points:

POINT I:
A: THE TRIAL COURT PROSECUTOR ABUSED ITS DISCRETION

B: THE PROSECUTOR COMMITTED MISCONDUCT AND ABUSED ITS PROCESS

C: THE TRIAL COURT PROSECUTOR ABUSED ITS DISCRETION

D: THE TRIAL COURT PROSECUTOR ABUSED ITS DISCRETION

A-2503-21

POINT II
A-S: THE TRIAL COURT ABUSED ITS
DISCRETION.

T-Z6: THE TRIAL COURT ERRORED AT
SENTENCE.

## II.

We begin with defendant's contention that the trial court erred by not ensuring his waiver of his right to counsel satisfied the mandates of State v. Outland, 245 N.J. 494, 506 (2021). Defendant maintains the colloquy was "like a quiz or a bar examination," rather than a provision of necessary information. When defendant was not able to answer his questions, the court just "accepted his ignorance."

Criminal defendants have a constitutional right to self-representation when the decision is made knowingly and intelligently. Id. at 505 (citing Faretta v. California, 422 U.S. 806, 835 (1975)). Relinquishing one's right to counsel requires the court to be satisfied the defendant understands the implications of the decision. State v. Crisafi, 128 N.J. 499, 509 (1992) (citing Faretta, 422 U.S. at 835). A defendant's right to self-representation "is about respecting [defendants'] capacity to make choices for [themselves], whether to [their] benefit or to [their] detriment." State v. Reddish, 181 N.J. 553, 585 (2004); see also State v. Rose, 458 N.J. Super. 610, 627 (App. Div. 2019). In State v.

A-2503-21

DuBois, 189 N.J. 454, 468-69 (2007), the Court synthesized the requirements of Crisafi and Reddish and provided sixteen topics about which the court must inform a defendant wishing to proceed pro se.  When a colloquy addresses the topics in large part but not completely, such a failure to inform does not necessarily render the waiver fatal.  DuBois, 189 N.J. at 475.

A trial court's determination that a defendant knowingly and voluntarily waived his right to representation is reviewed for abuse of discretion.  Ibid.  "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020) (internal citations omitted)).

Specifically, defendant maintains the trial court failed to provide him with the elements of an aggravated arson charge and the lesser-included offenses besides third-degree arson.  For example, he claims he was not informed the State was required to prove that the fire was started with the purpose of destroying the building and of the possible lesser-included charges such as criminal mischief or disorderly conduct.  Finally, he argues the court did not inform defendant of the statutory defenses available to him.  The State maintains

18

the record reflects defendant's understanding of the ramifications of proceeding pro se, and he made a knowing and intelligent waiver.

In its colloquy with defendant, the trial court addressed the nature of the charges, the possible penalties, the difficulties posed by procedural and evidentiary rules, possible complications with his own testimony, and that self-representation did not lead to favorable outcomes. While it is true that the court found defendant did not understand his statutory defenses, defendant testified his intended trial strategy of misidentification would not require them.

Moreover, defendant appropriately acknowledged the case had not been presented to a grand jury yet, so he did not know, but he would read up and understand the available defenses and lesser-included crimes. Defendant also testified as to his extensive prior history with the criminal justice system, including earlier successful self-representation. Like the defendant in Outland, defendant "did not waver in his desire to represent himself." 245 N.J. at 509. Like the "court-wise criminal who fully appreciated the risks of proceeding without counsel" in Crisafi, defendant proceeded "with his eyes open." 128 N.J. at 513 (citing Faretta, 422 U.S. at 835).

Further, review of the record shows a defendant who was dogged in his determination to self-represent, as evidenced by his conduct during pre-trial

motions practice, at trial, and post-trial. Defendant was made aware of the consequences of his self-representation at multiple points and still refused to rely on his standby counsel in any meaningful way, let alone make any indication that he was dissatisfied with his waiver. Since the focus of the colloquy is to determine defendant's actual understanding of the implications of waiver, which defendant repeatedly displayed both at the hearing and throughout these proceedings, the record reflects defendant's steadfast desire to self-represent would not have been impacted by any other colloquy.

III.

We next address defendant's argument that it was improper for Detective Masseroni to narrate the video and for Detective Hollo to testify the person on the video was later identified as defendant. Defendant distinguishes between the admissibility of an objective description of the action on the screen and a subjective commentary on the significance of that action. Defendant argues narration testimony must satisfy N.J.R.E. 701(b) and "assist in understanding the witness' testimony or determining a fact in issue," or otherwise it impermissibly invades the province of the jury. He also emphasizes that a police officer may not opine as to a defendant's guilt. He stresses neither officer was present at the scene during the arson and thus their review of the footage was no

20

different than the jury's, and their subjective opinions of the material facts and events depicted in the video violated N.J.R.E. 701.

Decisions on the admission or exclusion of evidence are subject to review for abuse of discretion. State v. Rochat, 470 N.J. Super. 392, 453 (App. Div. 2022). This includes an evidentiary ruling on the admissibility and scope of narration testimony. State v. Watson, 254 N.J. 558, 602 (2023) (citing State v. Singh, 245 N.J. 1, 20 (2021)).

Lay witnesses may testify "in the form of opinions or inferences if [the testimony]: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. In State v. McLean, 205 N.J. 438, 456 (2011),[6] the Court explained that to be admissible under N.J.R.E. 701, lay opinion testimony by police officers must

---

[6] Starting with McLean and ending with Watson, our Court has developed further principles in regard to "narration testimony." See also State v. Allen, 254 N.J. 530, 543-49 (2023) (involving testimony that the defendant's photo had been included in an identification array because the testifying detective thought defendant closely resembled the culprit); State v. Higgs, 253 N.J. 333, 363-67 (2023) (involving police testimony that dashcam video depicted a gun-shaped bulge in the defendant's waistband); Singh, 245 N.J. at 12-20 (involving police testimony that sneakers observed in video were similar to those the officer observed the defendant wearing when arrested); State v. Sanchez, 247 N.J. 450, 64-77 (2021) (involving parole officer testimony that a person in a surveillance photo was the defendant, a former parolee under the testifying officer's supervision); and State v. Lazo, 209 N.J. 9, 17-28 (involving police testimony that a prior arrest photo of a defendant closely resembled a composite sketch).

be based (1) on the officers' firsthand perceptions, and (2) must be helpful to the jury while not unduly prejudicial to a defendant. Additionally, lay opinion testimony must not constitute "an expression of a belief in defendant's guilt" or "an opinion on matters that were not beyond the understanding of the jury." Id. at 463.

The Watson Court clarified that law enforcement officers who were not present when the crime occurred generally were not permitted to offer the jury their subjective opinions about the contents of surveillance videos that recorded the criminal acts. 254 N.J. at 608. Synthesizing N.J.R.E. 701, 602, and 403, the Watson Court provided a framework for such determinations. Id. at 600-02. Narration testimony must not "offer opinions on the content of a recording or comment on reasonably disputed facts." Id. at 602. While the perception prong of N.J.R.E. 701 is satisfied when the witness' knowledge was acquired through reviewing video footage, whether the helpfulness prong is satisfied "turns on the facts of each case." Ibid. The Court also cautioned, "a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not." Id. at 603. The Court included "a reasonableness requirement to prevent a party from disputing all facts in a recording in a manner that does not reflect good faith." Ibid.

22

Defendant argues Detective Masseroni's testimony that the person in the video was "pouring something out, or turning his hand upside down, with the container that was in his hand," and later "attempting to ignite something," impermissibly infringed on the jury's role as factfinder. We are unpersuaded.

Detective Masseroni's testimony was largely a factual description of the events on the screen. Further, defendant's theory of the case was one of mistaken identity. It was not reasonably disputed that the man in the video carried a gas can, gathered trash from the alleyway, bent over the pile, and smoke and fire appeared shortly after he ran away. These were not facts defendant could "reasonably contend" were disputed. Therefore, even to the extent that Detective Masseroni's narration of the man's actions constituted a lay opinion and not a recitation of his factual observations, under the facts of this case, his testimony did not run afoul of Watson. Further, defendant elicited very similar testimony from Matisa during cross-examination.

Defendant also argues Detective Hollo impermissibly identified the individual on the screen as "Wendell Johnson," and "the individual we learned to be Wendell Johnson." Detective Hollo's identification testimony was more problematic than Masseroni's fact testimony because it amounted to an impermissible "expression of a belief in defendant's guilt . . . ." McLean, 205

23

N.J. at 463. However, we are unpersuaded that the admission of the officers' lay opinion testimony requires a new trial. Where such an impermissible identification is made during narration testimony, such an error may be harmless "given the fleeting nature of the comment" and in context of other, proper testimony. Singh, 245 N.J. at 17. Given the sustained objection and given the quality of the video footage and still shots, the identifications provided by Detective Matisa, Detective McNair, Parole Officer Traendley, and defendant's phone call to Detective McNair, Detective Hollo's impermissible identification testimony was not clearly capable of leading to an unjust result.

The compelling nature of this other incriminating evidence rendered the improvident admission of the officers' lay opinions harmless. Allen, 254 N.J. at 550 (holding that the "compelling" nature of the State's evidence overcame the trial court's error in admitting an officer's lay opinion testimony about what was depicted on a surveillance video). Further, neither defendant nor his standby counsel requested the curative instruction defendant now maintains was required. Our Supreme Court has cautioned that a new trial granted for an error "easily . . . cured on request[] would reward the litigant who suffers an error for tactical advantage . . . ." Singh, 245 N.J. at 13 (alteration in original) (citing State v. Santamaria, 236 N.J. 390, 404-05 (2019)).

24

IV.

We have duly considered all other points and sub-points raised by defendant and conclude they lack sufficient merit to warrant discussion in this opinion as the record either lacks factual support for, or blatantly contradicts, defendant's assertions.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-2503-21